FLORENCE A. STEUNENBERG, APPELLANT, V. NATIONAL PROGRESSIVE LIFE INSURANCE COMPANY ET AL., APPELLEES.

292 N. W. 737

FILED JUNE 14, 1940. No. 30838.

*Richard C. Hunter* and *M. L. Donovan,* for appellant.

*Clinton Brome* and *Jack Lee, contra.*

Heard before SIMMONS, C. J., EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ., and BLACKLEDGE, District Judge.

PAINE, J.

Plaintiff brought suit in equity to cancel an agreement by which she was induced to exchange $15,200 of notes, secured by real estate mortgages, for certificates of stock for the same amount in the Midland National Company. Plaintiff alleges that such agreement was obtained by reason of a conspiracy to defraud her. Plaintiff asks for an accounting, and, if her securities cannot be returned to her, for judgment for the amount due her. Trial court dismissed her petition without prejudice to an action at law to recover damages for fraud.

On March 28, 1935, the plaintiff filed her petition, and on June 25, 1935, filed an amended petition, in which she named as defendants National Progressive Life Insurance Company, Midland National Company, Joseph L. Lehman, Joseph F. Micek, Amos Thomas and Conn W. Moose, director of insurance of the state of Nebraska. In said amended petition she alleged that the first two defendants were Nebraska corporations; that Joseph L. Lehman was vice-president of the National Progressive Life Insurance Company, and in charge of its home office in Omaha, and

president of the Midland National Company; that Amos Thomas was president of the National Progressive Life Insurance Company and its general counsel.

Plaintiff further alleged that on November 15, 1932, she was the owner of notes, secured by seven real estate mortgages, for a face amount of $15,200, and, because some of the interest payments were in default, she was advised by Mabel K. Swanson to consult Joseph L. Lehman at the office of the National Progressive Life Insurance Company, which she did on said date in company with Mabel K. Swanson; that Lehman stated to them that the stock of the National Progressive Life Insurance Company, the World Insurance Company, and the Atlas Insurance Company was all held by the defendant Midland National Company, which holding company would receive all of the profits from the operation of said three companies, and that the National Progressive Company needed a little extra money or securities to increase its reserve fund, and offered to exchange stock in the Midland National Company for her mortgages, which would first have to be approved by Amos Thomas, president, and Dr. A. C. Stokes, director, of the National Progressive Life Insurance Company, and she was induced by such representations to leave four of her farm mortgages, amounting to $8,900, with the defendant.

On November 22, 1932, she returned to the office of the National Progressive Life Insurance Company, and while there one of the office girls came in and said, "Here are the mortgages from Mr. Thomas' office," whereupon Lehman informed her that her mortgage loans had been passed and accepted by Dr. Stokes and Amos Thomas as proper securities for the reserve fund of the National Progressive Life Insurance Company, and if she would deliver him the balance of her securities, which she then secured from her safety deposit box in the Omaha National Bank, he would give her shares in the Midland National Company for the face value of all her mortgages, to wit, $15,200, and that she would then be sure of receiving an income of at least $100 a month for life.

Believing and relying upon all of such representations made by Lehman as vice-president, general manager, and in charge of the home office of the defendant National Progressive Life Insurance Company, she assigned all of her farm mortgages, of the value of $15,200, and from time to time for some months thereafter she received checks alleged to be the earnings on her shares of stock in the Midland National Company, at 8 per cent. interest, as promised.

Plaintiff alleges that all of such representations were known to all of the defendants to be false, and were made in pursuance of an unlawful conspiracy to defraud plaintiff out of her securities. Plaintiff received purported dividends upon her stock in the Midland National Company to the sum of approximately $1,514.61, the last payment being given her on March 6, 1935, in the sum of $29.87, and alleges that all of said sums were paid to her to prevent her from ascertaining that she had been defrauded. Plaintiff prayed that the said contract be set aside and canceled, and that the court order her securities returned to her, and that, in the event that the defendants, or either of them, were unable to return to the plaintiff her securities, a judgment be entered in favor of the plaintiff and against the defendants for the actual value of the securities at the time they were delivered to the defendant National Progressive Life Insurance Company.

The answer of the National Progressive Life Insurance Company (which will be hereafter designated by the words "Insurance Company" alone) admitted its corporate character as a mutual insurance company, and the corporate character of the Midland National Company; admitted that Amos Thomas was at all times mentioned president and general counsel of the Insurance Company; alleged that it had no information or knowledge of the representations made by Lehman to plaintiff, nor any knowledge with regard to any negotiations plaintiff had with Lehman regarding the securities referred to; denied that plaintiff delivered any securities to Lehman as vice-president and manager in charge of the Insurance Company for the purpose of having

the same deposited in the reserve fund of the company, but that, if the securities were delivered to Lehman, it was in his individual capacity, and not for or on behalf of the Insurance Company, and alleged that Lehman at no time had any authority to accept any securities from plaintiff on behalf of the Insurance Company.

Said Insurance Company specifically denied that it entered into any plan or unlawful conspiracy to defraud her out of her securities, or that it had any knowledge of any fraud perpetrated upon her by Lehman, but admitted that plaintiff's mortgages were deposited with the insurance department of the state of Nebraska in the reserve fund of the Insurance Company, but that such securities when deposited were the property of the Insurance Company, having been purchased for a valuable consideration, without knowledge of any claim or right of the plaintiff in and to the same; admitted that on November 3, 1934, the general counsel, Amos Thomas, of the Insurance Company, drew an assignment by which Lehman assigned his interest in premium commissions due him or the Midland National Company to the plaintiff, and admitted that thereafter the National Progressive Life Insurance Company paid her the following checks: November 10, 1934, $4.75; December 10, 1934, $19.80; January 8, 1935, $13.59; February 5, 1935, $23.96; March 6, 1935, $29.87, as set out in her amended petition, but denied that such assignment was given to plaintiff as a part of any scheme or unlawful conspiracy to defraud her, but that it was prepared by Amos Thomas solely at the request of the plaintiff, and further entered a general denial to all other allegations of plaintiff's petition.

Joseph L. Lehman filed answer, in which he admitted that the two companies named as defendants were duly incorporated; alleged that on November 15, 1932, plaintiff, without solicitation on his part, came to him and entered into an agreement with him to purchase 15,200 shares of the capital stock of the Midland National Company, of which he was president, of the par value of $1 each, in exchange for her notes and mortgages, which had a face value of $15,200.

Defendant Lehman further alleges that plaintiff was a mature woman, of business experience, and alleges that no misrepresentations of any kind or character were made to her in connection with the transaction, and that she well knew the nature and character of the stocks she was purchasing; further alleges that during 1932 and 1933 he made various advances of money to plaintiff on account of her ownership of said stock, the exact amount of which is unknown to the defendant. The plaintiff's reply to each of said answers was a general denial.

The decree of the district court finds that the plaintiff exchanged her mortgage securities with defendant Lehman as a personal transaction, and not with him as an officer of the Insurance Company, but with the knowledge that her mortgages were to be made a part of the reserve fund of the Insurance Company, and that never until shortly before the commencement of this action did she make any claim against the Insurance Company to recover the mortgages or the proceeds.

The decree further sets out that to grant plaintiff an allowance of a rescission of the transference of her securities on a mere tender of the stock of the Midland National Company which she received from Lehman would be inequitable and unjust, and it is further ordered and decreed that the plaintiff's action be dismissed as against the defendants, but without prejudice to any action at law against any party to recover damages for fraud which the plaintiff may have suffered.

The plaintiff sets out ten specific errors for reversal, and discusses them under twenty principles of law. The principal contention is that the trial court erred in finding that her transaction was a personal transaction solely with Joseph L. Lehman, rather than as a result of any conspiracy to defraud, participated in by the Insurance Company.

To determine this question, we are required to carefully weigh the evidence relating to the alleged conspiracy. The evidence of the plaintiff tended to support the allegations of the amended petition which have been set out herein, and

clearly discloses that she was entirely misled into exchanging her $15,200 worth of mortgages for 15,200 shares of stock in the Midland National Company.

The plaintiff was urged to go to Lehman's office by Mabel K. Swanson, who was first secretly promised a commission of 10 per cent. by Lehman on all the securities plaintiff could be induced to turn in to him.

Exhibit No. 12 consists of a bundle of 20 checks, given to Mabel K. Swanson by Joseph L. Lehman, and signed by him, with the word "Agt." after his name. The first check was dated November 19, 1932, for $175, and the total of those introduced in evidence is $1,407.90.

Joseph L. Lehman testified that after he received the mortgages from plaintiff he exchanged them to the Insurance Company for some securities which they had. He said he talked the matter over with Mr. Micek and told him about the deal that he had made, and then he and Mr. Micek talked the matter over with Mr. Thomas about making the exchange and putting these mortgages into the Insurance Company, and the plaintiff's mortgages then went into the reserve deposit at Lincoln with the insurance department for the Insurance Company.

Lehman further testified that he remained with the Insurance Company for about two years after that time. In regard to promising her $100 a month on her stock in the Midland National Company, he said that he told her he would personally see to it that she would receive $100 a month for the first year. He said that the Midland National Company had some written and some verbal contracts with the Insurance Company for the production of insurance business. He testified that there might have been a certificate issued to Dr. A. C. Stokes, but the deal did not go through, and it was canceled.

Mr. Lehman admitted on cross-examination that the only assets the Midland National Company had at the time of the transaction with plaintiff were $4.11 in the bank and his contract with the Insurance Company to produce business. On cross-examination Mr. Lehman admitted that he

was in charge of the home office and had charge of sales and the records in the office at the time of taking over the plaintiff's mortgages, and that he was the only officer of the Insurance Company who occupied that office regularly.

Exhibit No. 31 is a seven-page letter addressed to Joseph L. Lehman, vice-president, National Progressive Life Insurance Company, 718 Omaha National Bank Bldg., Omaha, Nebraska, dated November 29, 1932, and signed by Arthur L. Loomis, of the bond department of the Omaha National Company, giving a complete description with ratings from the reports of Standard, Fitch and Moody upon the bonds which were exchanged by the Insurance Company for the mortgages of plaintiff, showing a value of about $10,000 for said bonds at that time.

Amos Thomas testified that he first met Joseph L. Lehman some time in 1930; that he investigated him and found he was an experienced insurance man, and some time in 1931 he went to work for the Insurance Company, and became an officer, and served until his resignation was accepted on August 31, 1934.

Mr. Thomas said that his law firm organized the Midland National Company for Mr. Lehman; that the written contract to write life insurance which Lehman had was assigned to the Midland National Company, with the consent and approval of the board of directors of the Insurance Company; that in the early part of December, 1932, Lehman said his Midland National Company had some farm mortgages that he would like to exchange for securities then on deposit with the state insurance department as part of the trust fund required to be maintained; that he examined the abstracts of title, and location of the property, and went to Lincoln and conferred with Lee Herdman, insurance commissioner, telling him that Lehman desired to exchange the mortgages, which were not liquid, for the bonds, so he could borrow money "to develop an agency organization to produce life insurance for the National Progressive Life Insurance Company."

Mr. Thomas testified that a little later he came back to

Lincoln and brought the specific securities with their appraised value, and upon that second trip Mr. Herdman issued an order to the security clerk to permit the exchange of $12,000 worth of bonds for $12,000 worth of real estate mortgages.

Mr. Thomas testified that the securities were indorsed in blank by Mrs. Steunenberg, whom he later recollected that he had known slightly when her name was Alexander and she was secretary for John L. Webster, but that the first time he ever met the plaintiff in connection with this deal was in September, 1934, when she complained about the transaction she had had with Lehman, saying Lehman had not kept his word as to payment of interest, and she was now penniless. Mr. Thomas testified he told her he was extremely sorry, but as the Insurance Company had paid substantial value for the mortgages, and bought them in good faith, he could not see that there was anything it could do about the matter, and that plaintiff replied that she did not blame Mr. Thomas, or the Insurance Company, for the situation.

Mr. Thomas denied that he knew that certificate No. 31, for 1,000 shares of stock in the Midland National Company, dated January 14, 1933, was ever issued in his name, and said he never received such certificate.

On cross-examination he testified that the offices of the Insurance Company were on the floor immediately beneath his law office, and directly connected by a stairway. He testified that the bonds exchanged for the plaintiff's mortgages had depreciated to a value of about $10,000 at the time the exchange was made.

Exhibit No. 10 is a certified copy of the annual statement as of December 31, 1932, made to the insurance department, showing that the National Progressive Life Insurance Company was incorporated July 28, 1927, and on April 5, 1928, commenced business, and that the following are the officers: Amos Thomas, president; Joseph L. Lehman and L. A. Dillovan, vice-presidents; secretary, John J. Brotherton; treasurer, Joseph F. Micek. All of the above officers were directors except John J. Brotherton.

In this exhibit No. 10 it shows the withdrawal of the bonds of $12,000 from the reserve of the Insurance Company, and in a line opposite each bond, under the heading, "Name of Purchaser," is written, "Florence G. Steunenberg." It is not explained why the plaintiff's name was used instead of that of Joseph L. Lehman.

The next annual meeting of the Insurance Company was held in Omaha, January 18, 1933. The report on the year's business was read, lists of the bonds and securities, receipts and disbursements were presented, and Joseph L. Lehman was unanimously elected to the board of directors to fill the unexpired term of John J. Brotherton, resigned, whereupon Joseph L. Lehman offered a resolution that the acts and doings of the board of directors, officers and committees, as shown by all minutes of previous meetings, and all expenditures as shown by their financial statement, are ratified and approved, and the annual statement for the year was signed by Amos Thomas, president, Joseph L. Lehman, vice-president, also by the actuary and treasurer.

At the annual meeting on January 17, 1934, held in Omaha, it shows that the following officers were present: Amos Thomas, president, Joseph L. Lehman, executive vice-president, Joseph F. Micek, secretary, William Pearlman, treasurer, and the executive vice-president submitted the report of the year's business, including a list of the bonds and securities held, and a statement of all receipts and disbursements, and again the resolution was adopted that all of the acts and doings of the board of directors, the officers and committees were ratified and approved.

While it does not appear in the transcript, it appears to be admitted in both the briefs that the action was dismissed as to Amos Thomas without prejudice during the trial, and that the insurance commissioner made a special appearance, which was sustained by the court.

With this rather complete summary of the evidence before us, the facts show that plaintiff was induced to go to the office of the Insurance Company by a supposed friend, and there was induced to exchange her good mortgages for

comparatively worthless stock by Lehman, the only officer of the Insurance Company regularly occupying that office; that Lehman immediately induced president Thomas, of the Insurance Company, to exchange plaintiff's mortgages for the Insurance Company's bonds, which bonds would be more liquid.

"In a conspiracy there must be a meeting of the minds of the parties charged, for the purpose of bringing about the act charged." *Ashby v. Peters,* 128 Neb. 338, 258 N. W. 639, 99 A. L. R. 843. In the case at bar, the evidence does not disclose such meeting of the minds, for Mr. Thomas testifies that he knew nothing at all about how Lehman had gotten these mortgages, and Lehman came to him and told him he needed money and that the mortgages were not good collateral to borrow on, and Lehman suggested an arrangement by which they could substitute the mortgages with the insurance reserve at Lincoln for certain bonds that were held as legal reserve of the Insurance Company in Lincoln. Mr. Thomas admits he examined the mortgages, but only as to their title and value to be taken in exchange for the bonds. So far as shown by the evidence, neither the Insurance Company nor Mr. Thomas got anything at all out of this exchange. It was made just to accommodate Mr. Lehman. The record shows that Mrs. Steunenberg was doing business with Mr. Lehman all the time, and with him alone. She says that she had implicit faith in Mr. Lehman. Mr. Lehman told her that he thought the stock he sold her would pay her $100 a month, which would be about 8 per cent. on her investment in his company, and he carried her along for about two years. Plaintiff continued to take payments from Lehman in small amounts for a long time after she knew that the business of the Midland National Company, in which she held stock, was not very good. Finally she went to see Thomas, and he told her that Lehman had been let out, and the only thing they could do for her would be to pay her any renewal insurance commissions due to Lehman, and they paid her some on these renewal commissions up to the time this suit was brought.

We are cited to the law that "A principal who puts an agent in a position that enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." 1 Restatement, Agency, sec. 261.

However, in the case at bar, Lehman did not hold out to plaintiff that she was transacting business with the Insurance Company, but made it very clear that she was receiving stock in the Midland National Company, of which he was president, so the rule cited does not apply.

An officer of an insurance company must act within the scope of his authority in order to bind his principal, unless his acts are ratified. *Kennedy v. Otoe County Nat. Bank,* 7 Neb. 59. No evidence of ratification appears in the record in the case at bar.

This court has held: "All persons dealing with the trustees of such a corporation must, at their peril, take notice of the powers granted by its articles of incorporation." *Horton v. Tabitha Home,* 95 Neb. 491, 145 N. W. 1023.

"A corporation is not chargeable with the knowledge nor bound by the acts of one of its officers in a matter in which he acts in behalf of his own interests, and deals with the corporation as a private individual, and in no way represents it in the transaction." *Koehler v. Dodge,* 31 Neb. 328, 47 N. W. 913.

"A principal is not answerable for the unauthorized fraud or misrepresentation of his agent, on the ground that the principal might have profited by the wrongful and unauthorized act, where there is no evidence that he either adopted or profited by it." 21 R. C. L. 905, sec. 82.

In the case at bar, the transaction was not within the course of Lehman's employment as a vice-president in charge of soliciting insurance, and while the Insurance Company did buy the plaintiff's mortgages of Lehman, it paid full value therefor to him, and knew nothing of the fraudulent transaction by which Lehman acquired them until nearly two years thereafter.

"One seeking to recover from a principal, for an unau-

thorized act of an agent, must establish that the principal obtained knowledge of such act before it had changed its position." *Maixner v. Travelers Ins. Co.*, 133 Neb. 574, 276 N. W. 163.

"The rule whereby an agent's knowledge is imputed to his principal is subject to an exception in the case of an agent who is engaged in an independent fraudulent scheme without the scope of the agency." *Houghton v. Todd*, 58 Neb. 360, 78 N. W. 634.

There is no question but that Lehman, as a vice-president and in charge of its office, could have bound the Insurance Company in the transaction of any business, for and in the name of such corporation, relating to the selling of life insurance, for which purpose alone he was employed. On the other hand, when he transacted his private business for another corporation, and a kind of business which was not in any way connected with the business of a mutual life insurance company, and in which it had no interest and derived no profit, we have reached the conclusion that the trial court was right in its decree, and the same is hereby AFFIRMED.