**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, Plaintiff,**

v.

**LANE CONTRACTING CORPORATION, Platte Valley State Bank, a corporation, the Board of Education of State Normal Schools of the State of Nebraska, the State of Nebraska, Ray Johnson, State Auditor of Nebraska, and Clarence L. E. Swanson, State Treasurer of Nebraska, Defendants.**

Civ. No. 465L.

United States District Court
D. Nebraska.

March 5, 1964.

Joseph C. Tye, Kearney, Neb., Edward E. Murane and David A. Scott, Casper, Wyo., for plaintiff.

Kenneth H. Dryden and John P. Jensen, Kearney, Neb., for defendant Platte Valley Bank.

Ray Johnson, State Auditor and Richard R. Larsen, State Treasurer, Melvin Kammerlohr, Asst. Atty. Gen., Nebraska, Lincoln, Neb., for defendants Board of Ed. of State Normal Schools of the State of Nebraska.

VAN PELT, District Judge.

This action was instituted on September 28, 1961, by Indemnity Insurance Company of North America, herein called I.N.A., to enjoin the Board of Education of State Normal Schools of the State of Nebraska and the State of Nebraska from paying to the Platte Valley State Bank located at Kearney, Nebraska, herein called Bank, any of the retained funds held by the State under a contract (See Exhibit 5) executed on March 24, 1960 between the Board of Education of the State Normal Schools of the State of Nebraska and Lane Contracting Corporation, herein called Lane, for the erection of a physical education building at Kearney State College. I.N.A. further asks to have all retained funds held by the defendants The Board of Education of State Normal Schools, the State of Nebraska, the State Auditor and State Treasurer under the contract paid to the plaintiff, and for judgment against the defendant Lane, under the indemnity agreement between Lane and I.N.A.

Two sets of bonds were executed by I.N.A. (See Exhibits 1, 2, 50 and 51). Each set is composed of a contract performance bond (Exhibits 1 and 50) and a labor and material payment bond (Exhibits 2 and 51). Each is dated March 25, 1960 and signed by Lane and I.N.A. Exhibits 50 and 51 are signed by Robert J. Burford, as Attorney-in-Fact. Exhibits 1 and 2 are signed by Carl R. Shultz, as Attorney-in-Fact. The Shultz power of attorney and the Burford power of attorney are on the same form (Exhibits 42 and 68). The second set of bonds (Exhibits 50 and 51) were executed, it appears, because of a Nebraska law requiring a resident agent to sign. Shultz lived in Des Moines, Iowa.

On March 25, 1960, Lane signed an application for a bond (See Exhibit 3). This application provided among other things:

"And for the further protection of the Company the undersigned, if such bond(s) be given in connection with a contract does hereby assign, transfer and set over to the Company, effective as of the date of such bond(s) in the event of any breach, default or abandonment of such contract or breach or default of such bond(s):

"(a) All right, title and interest of the undersigned in and to all machinery, plant, tools, equipment and materials of every nature and description that may now or hereafter be upon the site of the work embraced in said contract or elsewhere for the purposes thereof, including all materials purchased or ordered for said contract, whether completely fabricated or not;

"(b) All right, title and interest of the undersigned in and to any and all subcontracts entered into or which may be entered into in connection with such contract;

"(c) All right, title and interest of the undersigned in and to any and all deferred payments and retained percentages, and any and all moneys and properties that may be due and payable at the time of such breach, default or abandonment of such contract or breach or default of such bond(s), or may thereafter become due and payable to the undersigned on account of said contract, and the undersigned hereby agrees that all

such moneys and proceeds of such payments and properties shall be the sole property of the Company and shall be credited by the Company upon any claim, demand, loss, liability, cost, charge, attorneys' fees, expenses, suit, order, judgment or adjudication sustained or incurred heretofore or hereafter by the Company by reason of the execution of this or any other bond(s);

"(d) All other rights, titles and interests of the undersigned in any manner growing out of such contract or bond(s)."

The parties have agreed that the amount retained by the State is $96,425.00. The State claims no right to this sum. Its distribution thus becomes the primary concern of this case.

On April 28, 1960 Lane borrowed from the Bank the sum of $19,000.00; and to secure loans made by the Bank, Lane executed and delivered to the Bank an assignment of the proceeds to become due under its contract above mentioned for construction of the Physical Education Building (See Exhibit 6). The proceeds of this loan were deposited in Lane's bank account at the Bank. This loan was increased to $60,000.00 later. Lane was indebted to the Bank at all times from April 28th, 1960 until September 14, 1960, when all notes to the Bank were paid. From September 14th until October 5, 1960 Lane was not indebted to the Bank. See Exhibit 12 for a history of the indebtedness of Lane to the Bank.

On October 5, 1960 Lane borrowed $25,000.00 from the Bank. The proceeds of this loan were deposited in Lane's account at the Rock Springs National Bank, Rock Springs, Wyoming, where it was co-mingled with other Lane moneys in an account used by Lane as a general account, and from which payments had been made on other Lane jobs as well as on the Kearney job. On October 25, 1960 an additional $10,000 was loaned Lane by the Bank and this amount was also deposited in the Rock Springs bank and co-mingled with other funds in the ac-count. There were several renewals of these loans which then totaled $35,000, the last one being March 30, 1961.

The answer of the defendant Bank sets forth among other defenses that the money so loaned by it was used in payment of labor and materials in performing the Kearney contract. The evidence does not establish with any certainty that any part of the $35,000 was checked out in payment of items chargeable to the Kearney job, and the absence of proof that it was so used causes the court to conclude that the Bank has not sustained its affirmative allegation in that regard.

The renewal note dated March 30, 1961, not having been paid, suit was filed by the Bank in the District Court of Buffalo County, Nebraska, that being the county in which Kearney is located; and the Bank obtained a judgment against Lane on October 16, 1961 in the sum of $36,618.75 and costs taxed at $31.05.

In this case, tried to the court without a jury, the questions necessary for decision are

1) Does a surety, in this case, I.N.A., have a right of subrogation which relates back to the date of its surety obligation, and if so, are those rights superior to those of the Bank under its April, 1960 assignment?

2) Is an assignment taken by a surety in its application for a bond superior to the rights of a subsequent assignee?

3) Did Robert J. Burford, who held a power of attorney from I.N.A. for the writing of bonds, have authority to subordinate the priority of I.N.A. under its application and under its rights of subrogation, if such priority existed, to the Bank's claim, and if so

a) Did he by the letter of April 19, 1960, which is Exhibit 11, so subordinate such priority?

4) Is I.N.A. either by its action or its failure to speak, estopped to deny Burford's authority and to deny that he did so subordinate I.N.A.'s rights to those of the Bank under its assignment?

As is usual in such cases, the parties are in court primarily because the con-

tractor encountered financial difficulties during the construction of the project. It is indicated above, and is shown by the evidence, that at the time Lane was doing the Kearney construction, it also had several jobs in progress at other locations in Wyoming and Nebraska. On February 25, 1961 Lane owed $243,912.22 for labor and materials furnished on the Kearney job and had remaining under its contract with the State as retainages and undrawn amounts, the sum of $214,277.40. The $96,425.00 involved herein is the unpaid balance of this sum.

Lane became unable to meet its current bills on this job and, it would appear, on other jobs. I.N.A. was notified and on March 31, 1961 made its first advancement to Lane to complete the Kearney job. Additional amounts were thereafter advanced to Lane by I.N.A. While the total amount advanced without reimbursement is in dispute, the court finds that it is in excess of the $96,425.00 balance due from the State as above mentioned, and concludes that it is unnecessary to make an exact determination of that amount. All bills for labor and materials on the Kearney job have now been paid. The only remaining indebtedness is to the defendant Bank and to I.N.A.

Nebraska law is controlling as to this case. See Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, and Omaha P.P. Dist. v. Employers Fire Ins. Co., 8 Cir., 327 F.2d 912.

The Nebraska law dealing with a surety's right to retainages as opposed to a subsequent assignee from the principal is well established. Nebraska law, as hereafter appears, is based upon a leading case decided in the United States Supreme Court, to-wit, Prairie State Nat. Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412. The sole question in the Prairie Bank case was whether the bank's lien upon the 10% retained by the United States was paramount to the lien of one Hitchcock arising from his suretyship. Hitchcock, upon default of the contractors, assumed completion of the contract without knowledge of the rights of the bank, and his

claim was based upon his disbursements in its completion. The court discussed the applicable law at length and held that the contractors could not transfer to the bank any greater rights in the fund than the contractors possessed, that the bank's rights were subordinate to the surety's, and that the surety was entitled to the fund.

In First National Bank of Auburn v. Pesha, 99 Neb. 785, 157 N.W. 924, the Nebraska court had before it a case similar to the instant case. It involved a contract for the construction of a school. A labor and materialmen's bond was executed with Equitable Surety Company as surety. Subsequently, the contractor borrowed some money from the plaintiff bank and executed an assignment in favor of the bank of money to become due under the construction contract. The contractor defaulted, and the school district completed the building. Upon completion $2,906.85 payable under the contract remained in possession of the school district. The surety company was required under the bond to pay $4,442.27 in labor and materialmen's claims and received their assignments from the contractor. These assignments were subsequent to the assignment of the bank, however. The Nebraska court approved the Prairie State Nat. Bank case, supra, and held that the surety had a right of subrogation which related back to the date of the original contract. Thus, the Nebraska court held:

"A surety on the bond of a contractor given to secure the payment of all claims for labor and materials furnished in constructing a public building, who, after default by the contractor, has paid any of such claims, has an interest in any final balance due the contractor on completion of the building superior to that of the contractor's assignee, notwithstanding the fact that the assignment may have been executed and filed prior to payment of such claims by the surety, and was given in consideration of money advanced to the contractor and used by him

in the construction of the building." First National Bank of Auburn v. Pesha, 99 Neb. 785, 157 N.W. 924 (Syl.) (Headnotes in Nebraska are written by the court.)

The Pesha case was reaffirmed in Dakota County v. Central Bridge & Construction Co., 136 Neb. 118, 285 N.W. 309. This case involved a dispute over retainages by Dakota County for bridge work. After the contractor defaulted, the surety had paid out the face amount of the bond. Certain labor and materialmen, the surety company, and a bank to whom the funds had been assigned by the contractor, all claimed to be entitled to a first lien on the funds. As in the case at bar there was an assignment of the funds to the surety in the application for the bond. The Nebraska Supreme Court held that the bank's knowledge of the assignment was immaterial to a decision because of the doctrine of the Pesha case, which gave the surety a prior right to the fund. So far as the equities which arise in such a situation are concerned, the court held that the "stronger equities" were with the surety company having undertaken to pay the materialmen to the extent of the bond. In the present case no labor and materialmen were involved and, as above indicated, the Bank has failed to show that its money was expended on the Kearney job.

■ Under these cases so decided by the Nebraska Supreme Court it seems clear that the surety is entitled to a right of subrogation which right relates back to the time of execution of the contract between Lane and the State Normal Board and is thus superior to the assignment of the Bank even if the assignment taken by the surety in the application for bond did not exist. Since a laborer or materialman would have been entitled to have the fund retained by the State applied to the payment of such a claim, the surety is entitled to be subrogated to such right. This is particularly true in this case where all such claims have now been paid on the Kearney job.

■ Defendant Bank urges that the contractor was never in default, that I.

N.A. did not complete the Kearney job, and only loaned to Lane the funds necessary to finish the project. It is true that the payment of an obligation by one who is a mere volunteer and who has no legal or moral obligation to do so does not entitle that person to be subrogated. See Freeport Motor Cas. Co. v. McKenzie Pontiac, Inc., 171 Neb. 681, 107 N.W.2d 542.

■ It is doubtful if a formal default was ever declared by I.N.A. or anyone else, although the president of Lane testified that a rumor statement was made to him that the State of Nebraska had declared a default. However, it is certain, and the court so finds, that on March 31, 1961 when I.N.A. made its first advancement to Lane, Lane was unable to pay its current bills and obligations and that the balance it would receive under the contract would not pay the bills already incurred. The assignment to the surety above quoted in part, is conditioned not only on a default, but also on a breach of the contract. The assignment to the Bank and the failure to promptly pay for labor and materials, are each breaches of the contract. See Articles 33 and 22.

In United States Fidelity & Guaranty Co. v. Maryland Cas. Co., 186 Kan. 637, 352 P.2d 70, the court held:

"This court has recognized that a person secondarily liable who makes a payment for which subrogation is claimed for the protection of his own interests or in discharge of an existing liability is not to be regarded as a mere volunteer." (352 P.2d 76) (citations omitted)

■ Since I.N.A. would be liable on its bond and in event of default was legally obligated to pay the amounts due labor and materialmen, I.N.A. was not under the facts here shown a mere volunteer.

By providing the funds from which the labor and material bills were paid the surety under the cases herein cited became entitled to subrogation and has a right to the retained funds superior to

that of the Bank unless that right has been waived or cannot be claimed under estoppel principles.

We turn next to the contention of the Bank that I.N.A.'s rights were subordinated to the Bank's by a certain letter, Exhibit 11, dated April 19, 1960. This letter is addressed "Joe De Bord, Platte Valley State Bank, Kearney, Nebraska" and signed "Robert J. Burford." It is on printed stationery bearing at the top of the page in the largest print on the sheet the words "PINKERTON & COMPANY" and on a line below this and in smaller type appears an address "1710 Douglas St., Omaha, Nebraska"; at the bottom of the sheet is the symbol in an oval "INA" followed by the words, in smaller type than the name "PINKERTON & COMPANY" but larger than the type of the address above set forth "INSURANCE BY NORTH AMERICA". In the smallest type on the page are the names "Insurance Company of North America", "Indemnity Insurance Company of North America" and "Life Insurance Company of North America."

The position of Robert J. Burford is nowhere identified in the letter. Pinkerton & Company, it will be recalled, is the agency which wrote the bonds involved herein on which plaintiff is surety. See Exhibit 15.

The first three paragraphs of Exhibit 11 read:

"I am the Attorney-in-Fact for the Indemnity Insurance Company of North America who signed the bond for Lane Contracting Corporation's project for the Board of Education State Normal School. This bond for the construction of the Physical Education building was written in an amount of $860,145.00, and on an A.I.A.3–11 form.

"Mr. Tucker informs us that they are borrowing some money from you on assignment of their contract and we hereby acknowledge this assignment.

"We have bonded the Lane Contracting Corporation for some time now and we know that they will be a pleasant and constructive addition to the economic life of Kearney. They will do an excellent job on your physical education building and we hope they are the successful bidder on other projects in and around Kearney. I would consider it a personal favor if you will extend to them the facilities of your bank and we have already informed them that they can rely with confidence on your knowledge of Kearney and vicinity."

Defendant Bank argues that by the second paragraph above quoted I.N.A. subordinated its rights to those of the Bank and makes the claim, later discussed herein, that I.N.A. is estopped by reason of this letter and its conduct after learning of it, to claim a right superior to that of the Bank.

The evidence is in conflict as to whether Burford signed the letter as written and as to who dictated it in its final form. It is unnecessary for the court to resolve these disputes. I.N.A. claims that the letter does not purport to bind it and that Burford was without authority to subordinate its position.

Burford held a power of attorney from I.N.A. to execute certain bonds and undertakings. His exact power of attorney has been lost but it is undisputed that it was in the general form of the power of attorney of Carl Shultz, which is Exhibit 68. This is substantiated by Exhibit 42.

A reading of this power of attorney makes it clear that Burford's authority was to execute and deliver (the form recites additional verbs) bonds or undertakings in I.N.A.'s business of guaranteeing the performance of contracts and other instruments.

The power of attorney does not make Burford an employee of I.N.A. That it created a limited agency is shown by the power itself. It creates him "Its true and lawful agent and attorney-in-fact." " * * * the execution of such bonds or undertakings in pursuance of

these presents" is authorized. It is apparent from a reading of the power of attorney that Burford does not have any expressed authority to subordinate the surety's rights. His agency is only within the terms of the power of attorney.

Exhibit 11 does not state that it is a letter from I.N.A. Burford does not definitely purport to speak on its behalf although he does say he is attorney in fact for I.N.A. and uses the pronoun "we" five times, the pronoun "us" once, and the pronoun "I" is used four times.

Exhibit 11 is written on a Pinkerton & Company letterhead even though furnished by I.N.A., a deducible, although unproven, fact. It seems just as logical to conclude that Burford was speaking for himself or for Pinkerton & Company as that he was speaking for I.N.A. It is unnecessary, however, to resolve that issue in view of the court's conclusion hereinafter reached that Burford's agency to subordinate I.N.A.'s liens is not established.

The court does find that Exhibit 11 does not purport to subordinate any lien. At most it shows knowledge of an assignment not yet in existence. The assignment was dated nine days later (See Exhibit 6). The court believes it would be unjust to read into Exhibit 11 a subordination or waiver of priorities when the letter does not make mention of such. This conclusion is supported also by the fact that in the two letters of April and July, 1961, Exhibits 66 and 31, the Bank makes no claim that Exhibit 11 constitutes a subordination or waiver. Exhibit 31 could be considered an admission that at that time, July 6, 1961, the surety had not made "a definite commitment as to our position."

The case law supports these findings. The question of agency is one of fact. There is no presumption of its existence. It was said by the Nebraska Supreme Court

"The party alleging the existence of the agency relationship assumes the burden of proving the agent's authority and that the acts of the agent, for which liability against the principal is sought, must be shown to be within the scope of the agent's authority." Meier v. Geldis, 148. Neb. 234, 237, 26 N.W.2d 813.

This is in accord with Steunenberg v. National Progressive Life Ins. Co., 138 Neb. 240, 292 N.W. 737, in which the Nebraska Supreme Court said:

"An officer of an insurance company must act within the scope of his authority in order to bind his principal, unless his acts are ratified. Kennedy v. Otoe County Nat. Bank, 7 Neb. 59." (138 Neb. 251, 292 N.W. 743)

It would seem reasonable that the Bank if tendered a bond signed by an attorney-in-fact would require a copy of the power of attorney whereby it could check on the authority of the agent to bind the surety. In such an important matter as the subrogation or subordination of rights it would seem that good business practice would dictate the same inquiry. Burford's authority to bind I.N.A. by Exhibit 11 has not been established.

Defendant Bank next urges that Burford was clothed with apparent or ostensible authority to bind the principal by the sending of Exhibit 11 even if actual authority is lacking.

Ostensible authority is that authority which the principal either intentionally or as the result of lack of ordinary care permits the agent to exercise and in so doing induces third persons to act thereon. See Nebraska Tractor & Equipment Co. v. Great Lakes Pipe Line Co., 156 Neb. 366, 56 N.W.2d 288. The Nebraska Tractor case also points out that the apparent authority must cause the third person to act, or in other words, the third person must rely thereon. First Nat. Bank of Hastings v. Farmers' & Merchants' Bank, 56 Neb. 149, 76 N.W. 430. It is also necessary that the apparent authority be traceable to the principal himself. As stated in Rodine v. Iowa Home Mutual Cas. Co., 171 Neb. 263, 106 N.W.2d 391,

"Apparent or ostensible authority or agency for which a principal may

be liable must be traceable to him and cannot be established by the acts, declarations, or conduct of the agent. The principal is only liable for appearance of authority caused by himself. Ostensible and apparent agency have been treated in this jurisdiction as being synonymous." (171 Neb. 274, 106 N.W.2d 397)

The Bank's case as to Burford's authority is largely based on the acts of the agent, and the case just cited is therefore applicable. The appearance, if any, of authority was caused not by the surety but by the agent.

■ Again, the evidence shows nothing upon which the defendant Bank could have relied to establish the apparent authority of the agent, Burford, to subordinate the claim of I.N.A. to that of the Bank. It is true that exhibits such as Exhibit 17 show an exercise of authority by Burford in excess of that usually exercised by an agent whose authority is restrained strictly to that of selling bonds. However, it was subsequent to the time when the note to the Bank was executed and the time when Exhibit 11 was written by Burford. Such evidence could therefore not have been relied upon by the Bank, as would be necessary to find the principal, I.N.A., bound by apparent authority.

The Bank also contends that the surety company is now estopped to deny the priority of the Bank's claim because of assurances made by I.N.A.'s agents and officials that its note from Lane would be paid by I.N.A.

■ A review of the applicable law is likewise helpful here.

" 'To constitute an equitable estoppel, there must exist a false representation or concealment of material facts; it must have been made with knowledge, actual or constructive, of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted upon; and the party

to whom it was made must have relied on or acted upon it to his prejudice.' Walker v. Ehresman, 79 Neb. 775, 113 N.W. 218." American Surety Co. of N. Y. v. Smith, Landeryou & Co., 141 Neb. 719, (Syl. 6), 4 N.W.2d 889, 894.

The Nebraska doctrine of estoppel was applied in Cotner College v. Estate of Hester, 155 Neb. 279, 51 N.W.2d 612, a case in which this court appeared as counsel. The Nebraska Court approved 31 C.J.S. Estoppel § 59 p. 236, reading:

"Equitable estoppel or estoppel by misrepresentation is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct; and it arises where a person, by his acts, representations, or admissions, or even by his silence when it is his duty to speak, intentionally or through culpable negligence induces another to believe that certain facts exist, and the other person rightfully relies and acts on such belief, and will be prejudiced if the former is permitted to deny the existence of such facts."

This doctrine was reaffirmed recently in Wenzel v. Wenzel, 174 Neb. 61, 115 N.W. 2d 788.

Counsel for the defendant Bank argue that representations made by agents of I.N.A. that the Bank's claim would be "taken care of" along with other labor and materialmen claims now estops the plaintiff from asserting its prior right to the retainages because the Bank, in reliance thereon, failed to take protective measures against Lane at a time when they would have been effective.

In support of the Bank's claim Exhibits 17 and 21 are relied upon and the deposition of John Helleberg, Jr. was read in evidence. Mr. Helleberg was interested as the architect in the payment of the bills incurred for the construction before he issued certain architect's certificates. He talked by telephone to certain claimed representatives of I.N.A.,

among them Burford, Frank Eisele, in Des Moines, and Elmer White, in Philadelphia. He also talked with Mr. Murane, counsel for I.N.A. at Casper. The most favorable testimony on this so far as the Bank is concerned is from Helleberg. It appears that Helleberg had listed certain unpaid bills, including the claim of the Bank, and furnished it to I.N.A. Helleberg, in relating his conversations with the persons, never stated that anyone told him that the Bank's bill would be paid. For example, on page 34 of his deposition there appears this question and answer:

"Q. (By Mr. Jensen) Now, you had been talking to Mr. White and Mr. Eisele and Mr. Burford, about paying these subcontractors?

"A. That is right."

On the next page the witness stated:

"A. Well, in my telephone conversations with Mr. Murane, and Mr. Eisele, they stated to me that they were the Surety and they would see that the materialmen and subcontractors would be paid on the contract. That's the whole basis for a performance and labor and material bond on a project."

Later on he stated:

"A. Yes, I think one of my letters states that, that I felt with such a large account as the one with the Platte Valley Bank still outstanding, I didn't feel justified to release money beyond the ten per cent retainage as I stated previously."

Mr. Helleberg also testified that he doesn't know whether any of the money borrowed by Lane from the Platte Valley Bank was actually used on the Kearney job or some other job. He also testified that there wasn't any question but that Lane had financial difficulty before the job was finished; that he had complaints from materialmen and laborers that Lane was not paying their bills. (See pp. 64–66)

The court in examining Mr. Helleberg's deposition cannot find where at any point he stated that any of the I.N.A. representatives told him that the Bank's bill would be paid. There is testimony from which the court could conclude that he was told that the materialmen and sub-contractors would be paid. At least one such answer has been above set forth.

Mr. Helleberg also stated that he advised all sub-contractors, materialmen and others who called him on claims to take whatever legal action they thought proper; that he felt all he could do would be to withhold the funds under Article 26 so that there would be enough to pay the outstanding claims.

The burden of proof of establishing an estoppel is upon the Bank. As is set forth above, the evidence establishes rather clearly not that the Bank's claim was to be paid by I.N.A. or was to be subordinated to I.N.A.'s assignment or rights of subrogation or that it was to be paid out of the retainages, but rather that labor and material only was to be paid. It is clear that the Bank's claim was neither. The court does not feel that the facts proved amount in law to an estoppel and concludes, as has been indicated above, that the Bank has not established any of its pleaded defenses.

There is also a serious question as to whether the defendant Bank relied upon the representations of plaintiff or any statements made by Helleberg, the architect. The case of Western Casualty & Surety Co. v. Meyer, 301 Ky. 487, 192 S.W.2d 388, 164 A.L.R. 769, on which the Bank relies is regarded as clearly distinguishable from the case at bar. In the Kentucky case the court found that the agent for the surety company made express assurances of protection under the bond to the party loaning the money. No such assurances are found in this case.

It is also claimed that the surety company failed to expressly deny what is claimed to be the acknowledgment made by Burford. It has been recently stated by the Nebraska court in Scottsbluff Nat. Bank v. Blue J Feeds, Inc. 156 Neb. 65,

54 N.W.2d 392, quoting from Scharman v. Scharman, 38 Neb. 39, 56 N.W. 704,

" 'To sustain an estoppel because of the omission to speak, there must be both the specific opportunity and the apparent duty to speak. The party maintaining silence must have known that some one was relying thereon, and was either acting, or about to act, as he would not have done had the truth been told.' "

█ It is to be remembered here that so far as established by the testimony the surety did speak and said it would pay labor and materialmen but did not say it would pay the Bank. It is not clear from Exhibit 11 that there was an attempt to bind the surety to any waiver of the surety's rights. Even if there was, as above suggested, it seems certain that Burford did not have authority; and the Bank, under the facts of this case, should not be relieved from its duty to ascertain the limits of Burford's authority.

Even though the Bank's claim was included in the list sent to the surety the response that the claims for labor and material would be paid was not only an assurance that such claims would be paid but should have indicated to the Bank that a claim such as the Bank's, it not being a claim of a laborer or materialman, was not included in the claims to be paid. The court concludes that justice will not be served in this case by allowing the Bank to have priority over the rights of the surety for an indebtedness no part of which has been shown to have been used on the Kearney job. As above indicated, the Bank does not have as strong a case as the bank had in the Dakota County case, supra, which, with the Prairie State Nat. Bank and the Pesha cases, the court concludes are controlling.

During the trial the court reserved ruling upon the admission of certain testimony and exhibits. Recently the Court of Appeals for the Eighth Circuit in the case of Pritchard v. Downie, Admr., 326 F.2d 323 (1964), stated:

"We have frequently stated that it is virtually impossible for a trial judge in a nonjury case to commit reversible error by receiving incompetent evidence. Green v. Dingman, 8 Cir., 234 F.2d 547, 553; Builders Steel Co. v. Commissioner, 8 Cir., 179 F.2d 377, 379."

The court is therefore overruling the objections as to any testimony or exhibits on which it reserved ruling at the time of trial.

The court upon presentation by counsel for plaintiff will sign a judgment ordering payment by the State of Nebraska of the sum of $96,425.00 to plaintiff Indemnity Insurance Company of North America, and for its costs.

This opinion will constitute the court's findings of fact and conclusions of law.