D. JEFF DRAEMEL, APPELLANT, V. RUFENACHT, BROMAGEN & HERTZ, INC.; WILLIAM M. CHAPMAN, DOING BUSINESS AS CHAPMAN COMMODITIES; AND PATRICK GOTTSCH, JR., APPELLEES.

392 N.W.2d 759

Filed August 15, 1986.    No. 85-289.

Gary L. Hoffman of Erickson & Sederstrom, P.C., for appellant.

Thomas C. McGowan of McGrath, North, O'Malley & Kratz, P.C., for appellees Rufenacht, Bromagen & Hertz, Inc., and Chapman.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

KRIVOSHA, C.J.

D. Jeff Draemel appeals from an order granting summary judgment in favor of the appellees Rufenacht, Bromagen & Hertz, Inc. (hereinafter referred to as RB&H), and William M. Chapman, doing business as Chapman Commodities. Draemel commenced this action by filing a petition in the district court for Douglas County, Nebraska, seeking to recover damages against RB&H, Chapman, and Patrick Gottsch, Jr., for alleged acts of conversion committed by Gottsch while acting as agent for RB&H and Chapman. Specifically, Draemel alleged that Gottsch, while acting as agent for RB&H and Chapman, took moneys from Draemel which were to have been invested for and on behalf of Draemel and, instead, converted the funds to his own use. Both RB&H and Chapman denied that portion of Draemel's petition alleging that Gottsch was their agent or had apparent authority, and both also asserted a cross-claim against Gottsch.

Thereafter, RB&H and Chapman each moved for summary judgment. The district court acknowledged that there may be an issue of fact as to whether Chapman, and thus RB&H, clothed Gottsch with apparent authority to act as a commodities broker, but, nevertheless, it found that because Gottsch's action in converting the funds to his own use obviously exceeded his apparent authority, the motion for summary judgment should be granted. We believe that the district court was in error in that regard and that the decision must therefore be reversed and the cause remanded.

The evidence, as presented in support of the motion for summary judgment, discloses that Chapman operates a commodities futures brokerage firm in Omaha, Nebraska. It has an exclusive arrangement with RB&H's clearinghouse for all of Chapman's orders. RB&H receives the commission on each transaction and remits a portion back to Chapman. RB&H also provides Chapman with account cards and risk disclosure forms for transacting business.

In October or November of 1979, Gottsch began working for

Chapman as a commodities broker on a commission basis. Gottsch's license with the Commodity Futures Trading Commission was registered through RB&H, and Gottsch received his commission directly from Chapman. Gottsch operated out of Chapman's newly established Elkhorn, Nebraska, office. At that office Gottsch had a telephone and direct line to the Chicago Mercantile Exchange. The line was paid for by RB&H. A "Chapman Commodities" sign was erected at the Elkhorn office, and Chapman provided Gottsch with account cards and risk disclosure forms bearing the name of RB&H. Gottsch's duties included receiving money from customers. Gottsch, contrary to office policy, had the customers make the checks payable directly to him. Chapman was aware that at least some of the checks were made payable to Gottsch.

After some time, Chapman discovered that Gottsch had engaged in unauthorized trading of customer accounts. Chapman advised the affected customers and ordered Gottsch to remedy the situation but did not at that time discharge Gottsch. Chapman later discovered that Gottsch was overtrading accounts, resulting in a loss of $50,000 to $75,000. Gottsch was discharged by Chapman in May of 1980.

After Gottsch was discharged, however, Chapman continued to maintain the Elkhorn office, and Gottsch continued to have access to the office until April of 1982. Gottsch was instructed to destroy the "Chapman Commodities" sign, which Gottsch claims he did. Draemel maintains, however, that the sign was present when he dealt with Gottsch. The record is unclear as to whether Chapman ever did anything to determine that the sign was removed or destroyed. Gottsch also continued to have use of the telephone, the direct line to the Chicago Mercantile Exchange, and the account cards and risk disclosure forms bearing the name of RB&H.

In December of 1980 Draemel was referred to Gottsch by a mutual friend. Gottsch represented himself to be an employee of Chapman and gave Draemel a business card with RB&H's name on it.

In January of 1981 Draemel went to the Elkhorn office to

meet with Gottsch. Draemel maintains that the "Chapman Commodities" sign was still in place. A speakerphone was monitoring trades made by Chapman. At this time Draemel gave Gottsch a check for $25,000 and executed an account card and risk disclosure statement bearing the name RB&H. The check was made out to Gottsch personally, as were all other checks given by Draemel to Gottsch.

Later, in May of 1981, Gottsch gave Draemel another account card and risk disclosure form bearing the name RB&H. Draemel gave Gottsch checks totaling $127,500.

The evidence further discloses that during the course of his dealings with Gottsch, Draemel telephoned Chapman's Omaha office and left messages for Gottsch. Although this was apparently at a time after Chapman had discharged Gottsch, no one at the Chapman office informed Draemel that Gottsch had been discharged, and the messages were accepted.

At some later time Gottsch advised Draemel that due to adverse market movements there were no longer any funds in his account. Draemel asked to see his file but was not given access to it. In June of 1982 Draemel apparently began to suspect that Gottsch had converted the funds to his own use. Upon reviewing the trading record, Draemel discovered that the account had a negative balance. Draemel agreed to give Gottsch time to try to recoup the losses. In October of 1982, however, Gottsch admitted that he had converted the funds to his own use and had never even opened accounts in Draemel's name.

The funds which Draemel gave to Gottsch apparently were the funds of other investors given to Draemel for the purpose of investing.

The only question presented to us by this appeal is whether the district court erred in granting summary judgment. The rules under which a summary judgment may be granted are clear in Nebraska. In *Brown v. Nebraska P.P. Dist.*, 209 Neb. 61, 64, 306 N.W.2d 167, 169 (1981), we set out those rules, saying in part: "The primary purpose of the summary judgment statute is to pierce sham pleadings and to further dispose of cases where there is no genuine claim or defense." We went on further in *Brown, supra*, to say: "The court examines

the evidence, with a view most favorable to the party against whom the motion is directed, to discover if any real issue of fact exists. If reasonable persons might reach different conclusions, the motion should be denied and the case tried on its merits." (Syllabus of the court.) And in *Hall v. Hadley*, 173 Neb. 675, 679, 114 N.W.2d 590, 592 (1962), we said: " 'The Summary Judgments Act authorizes summary judgment only where the moving party is entitled to judgment as a matter of law, where it is clear what the truth is, and that no genuine issue remains for trial.' "

We held that summary judgment was not appropriate in the case of *Metro. Tech. Community College v. South Omaha Industrial Park*, 207 Neb. 472, 476, 299 N.W.2d 535, 537 (1980), wherein we said:

> " 'The moving party is not entitled to summary judgment except where there exists no genuine issue as to any material fact in the case and where under the facts he is entitled to judgment as a matter of law.' " The issue on a motion for summary judgment is whether or not there is a genuine issue as to any material fact and not how that issue should be determined. In considering such a motion, the trial court must take that view of the evidence most favorable to the party against whom the summary judgment is directed, giving to that party the benefit of all favorable inferences that may be reasonably drawn from the evidence.

We went on further in the *Metro. Tech. Community College* case at 476, 299 N.W.2d at 537, to say:

> This court has stated that summary judgment is not appropriate, even where there are no conflicting evidentiary facts, if the ultimate inferences to be drawn from those facts are not clear. [Citations omitted.] Likewise, we have stated that summary judgment should not be used to deprive a litigant of a formal trial if there is a genuine issue of fact.

And in *Bank of Valley v. Shunk*, 208 Neb. 200, 205-06, 302 N.W.2d 711, 715 (1981), we said: "Summary judgment is an extreme remedy and should be awarded only when the issue is clear beyond all doubt. Any reasonable doubt touching the

existence of a material issue of fact must be resolved against the moving party."

As noted by the trial court, there is a question of fact as to whether Gottsch had apparent or ostensible authority to act as an agent. Apparent or ostensible authority may be conferred if the alleged principal affirmatively, intentionally, or by lack of ordinary care causes third persons to act upon the apparent agency. See *Wolfson Car Leasing Co., Inc. v. Weberg*, 200 Neb. 420, 264 N.W.2d 178 (1978). The apparent or ostensible authority or agency for which a principal may be liable must be traceable to him and cannot be established by the acts, declarations, or conduct of an agent. See *Berg v. Midwest Laundry Equipment Corp.*, 175 Neb. 423, 122 N.W.2d 250 (1963), *supp. op.* 175 Neb. 874, 124 N.W.2d 699. See, also, *Wolfson Car Leasing Co., Inc. v. Weberg, supra*.

Although RB&H and Chapman contend that there are no acts or omissions traceable to them which clothe Gottsch with apparent authority, the evidence as presented to the district court on the motion for summary judgment, viewed most favorably for Draemel and against RB&H and Chapman, creates a genuine issue of a material fact. Chapman claims he told Gottsch to take the Chapman Commodities sign down, and Gottsch claims he took it down. Draemel maintains that the Chapman Commodities sign was still erected and in place when he dealt with Gottsch. Neither RB&H nor Chapman maintains at this time that either checked to determine that the sign was down. Additionally, Chapman permitted Gottsch to retain possession of account cards and risk disclosure forms and business cards, all carrying the name of RB&H. Further, Chapman apparently permitted Gottsch access to the Chapman Elkhorn office and, thus, access to the telephone lines and the direct line to the Chicago Mercantile Exchange. Certainly, some inferences may be drawn from the fact that when Draemel called Chapman looking for Gottsch, he was never told that Gottsch was no longer employed by Chapman, and in fact messages for Gottsch were accepted, leaving open the inference that Gottsch was still associated with Chapman. The district court was correct in concluding that there was a material fact question existing as to whether RB&H and Chapman had

clothed Gottsch with apparent authority, either intentionally or negligently. How that matter may ultimately be resolved, we do not pass upon at this time. We do, however, recognize, as did the district court, that a question of fact exists as to whether such apparent authority existed.

The district court, however, concluded that even if there was apparent authority given to Gottsch by RB&H and Chapman, Gottsch exceeded that apparent authority to act as a commodities broker when he accepted checks made payable to him and invested them in his own account. In reaching that conclusion the district court relied upon our earlier decision in *Burchmore v. Byllesby & Co.*, 140 Neb. 603, 1 N.W.2d 327 (1941). We believe, however, that neither the *Burchmore* case nor the law generally can support such a conclusion at this time.

In *Burchmore, supra*, suit was brought by an heir of Mrs. Burchmore against the defendant brokerage house to collect damages for allegedly converting a certificate of stock belonging to Mrs. Burchmore and given by Mrs. Burchmore to an agent of the defendant brokerage house prior to her death. Denying liability, we specifically pointed out that the record was silent as to conditions under which the stock was received by the agent or what happened to the proceeds. We said at 608, 1 N.W.2d at 331:

> The problem here is not one of disputed facts but rather disputed conclusions drawn from those facts. A court is not at liberty to conjecture, nor a jury to imagine, the facts which appear to have been known only by Blissard and Mrs. Burchmore. Their lips are sealed by death.

We simply concluded that there was no evidence to establish what Mrs. Burchmore thought she was doing when giving the agent the stock to sell. There was evidence that the agent had acted on a number of occasions personally for Mrs. Burchmore and, therefore, could have been acting either in an agency capacity or in an independent capacity. Such is not the case here. There is evidence that Draemel thought he was giving Gottsch the money as an agent of RB&H and Chapman. The law in this jurisdiction, as in most others, is clear that the principal may clothe another with apparent authority, thereby binding the principal or causing the principal to be held liable

for the agent's misdeeds. In *Moore v. Puget Sound Plywood*, 214 Neb. 14, 19, 332 N.W.2d 212, 216 (1983), we said:

> " 'Where a principal has, by his voluntary act, placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform a particular act, and therefore deals with the agent, the principal is estopped as against such third person from denying the agent's authority. . . .' "

We went on further in *Moore, supra,* to say: "Apparent authority . . . may exist beyond termination of the principal-agency relationship when notice of the termination has not been given." (Syllabus of the court.) We concluded in *Moore, supra* at 19, 332 N.W.2d at 216: " ' "Whether or not an act is within the scope of an agent's apparent authority is to be determined under the foregoing rule as a question of fact from all the circumstances of the transaction and the business." ' "

The fact that Gottsch's actions in this case were fraudulent and, obviously, exceeded his authority is no defense if the action in receiving the money was within his apparent authority and what he did with the money unknown to the third person. In *Oddo v. Interstate Bakeries, Inc.*, 271 F.2d 417 (8th Cir. 1959), *supp. op.* 271 F.2d 959, an employee of the defendant bakery falsified delivery tickets for bread delivered to the plaintiff. Obviously, the employee had no authority to falsify the delivery tickets nor to overcharge the plaintiff. In a suit by the customer against the bakery, the U.S. Court of Appeals for the Eighth Circuit said at 423: " 'A corporation is liable for a fraud perpetrated on a third person by its agent within the apparent scope of his authority or the course of his employment * * * despite the fact that the corporation did not authorize, concur in or know of the fraud.' " And in *Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir. 1967), the U.S. Court of Appeals for the Eighth Circuit said: "[U]nder common law principles, a principal is liable for the deceit of his agent committed in the very business he was appointed to carry out. This is true even though the latter's specific conduct was carried on without knowledge of the principal." And in 3 Am. Jur. 2d *Agency* § 273 at 776-77

(1986), the author notes:

> If an act done by an agent is within the apparent scope of the authority with which he has been clothed, it does not matter that it is directly contrary to the instructions of the principal. The principal will, nevertheless, be liable unless the third person with whom the agent dealt knew that he was exceeding his authority or violating his instructions. Thus, if one appoints an agent to conduct a series of transactions over a period of time, it is fair that he should bear losses which are incurred when an agent although without authority to do so, does something which is usually done in connection with the transactions he is empowered to conduct.

See, also, Restatement (Second) of Agency § 261, comment *a.* (1958).

And in 3 Am. Jur. 2d, *supra* § 274 at 777, the author notes:

> The rule that a principal is liable for the contracts of his agent applies even though the agent, in contracting, acts in his own interests and adversely to his principal, where the party with whom the agent contracts has no knowledge of the agent's dereliction and is not cognizant of any fact charging him with knowledge thereof. The principal, having selected his representative and vested him with apparent authority, should be the loser in such case, and not the innocent party who relied thereon.

While it is true that Gottsch did not have authority to convert the funds to his own use, it is likewise true that he did have authority to accept the funds, at least while employed by Chapman.

Where, as here, a genuine issue exists as to whether and, if so, to what extent RB&H and Chapman clothed Gottsch with apparent authority to act as a broker/agent for and on behalf of RB&H and Chapman, there must likewise exist a genuine issue as to whether Gottsch exceeded that apparent authority by accepting checks from Draemel and using them for his own purpose. If, in fact, the evidence should establish that Draemel could not or should not have known that making the checks payable directly to Gottsch was contrary to company policy, RB&H and Chapman may be liable. See, *Hatrock v. Edward*

*D. Jones & Co.*, 750 F.2d 767 (9th Cir. 1984); *Henricksen v. Henricksen*, 640 F.2d 880 (7th Cir. 1981); *Fey v. Walston & Co., Inc.*, 493 F.2d 1036 (7th Cir. 1974).

The evidence ultimately may be insufficient to establish such liability. That, however, is not the question to be addressed at this point. The question here is simply whether there exists a genuine issue as to these matters. We believe that such a genuine issue does exist and that summary judgment, therefore, should not at this time have been granted.

Appellees cite us to *Rodine v. Iowa Home Mutual Cas. Co.*, 171 Neb. 263, 106 N.W.2d 391 (1960), and *Wolfson Car Leasing Co., Inc. v. Weberg*, 200 Neb. 420, 264 N.W.2d 178 (1978), as well as *Steunenberg v. National Progressive Life Ins. Co.*, 138 Neb. 240, 292 N.W. 737 (1940). We do not believe, however, that any of those cases are material to the question of apparent authority and ultimate liability. In the *Rodine* case, *supra*, the question was whether the agent had authority to bind the company. There was no evidence of that fact. In finding against the plaintiff we said at 277, 106 N.W.2d at 398: "A principal is not bound if the agent exceeds the scope of his authority and the absence of authority is *known* to the person dealing with him or if the third person knows or should know the limitation of the authority of the agent." (Emphasis supplied.) In the instant case that matter is a question of fact.

Likewise, in *Wolfson Car Leasing Co., Inc.*, the agent never represented himself as being an agent of Wolfson Car Leasing Co., nor did Wolfson Car Leasing Co. ever give anyone reason to believe that the alleged agent was an agent of Wolfson Car Leasing Co. Denying recovery, we said at 427, 264 N.W.2d at 183: "The defendants testified that they at all times believed Silliman to be the agent of United States Steel Corporation and not the agent of Wolfson."

And, finally, in *Steunenberg, supra*, we again found that the evidence established as a matter of law that there was no agency relationship, actual or implied. We said in *Steunenberg* at 251, 292 N.W. at 743: "However, in the case at bar, Lehman did not hold out to plaintiff that she was transacting business with the Insurance Company, but made it very clear that she was receiving stock in the Midland National Company, of which he

was president, so the rule cited does not apply."

. As we have already indicated, we are not at this time able to determine what, if any, liability either RB&H or Chapman may have. We do, however, believe that the mere fact that an agent violates his or her authority, if it is in the course of the principal's business, is not sufficient to relieve the principal of liability. As noted in the Restatement (Second) of Agency § 261 at 570 (1958): "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." In the instant case, if RB&H and Chapman did clothe Gottsch with authority, they clothed him with authority to engage as a broker and to receive funds from Draemel and invest them. To suggest that by converting the funds, Gottsch exceeded his authority and therefore relieved the principal of liability is in error.

RB&H and Chapman further contend, however, that Draemel cannot maintain an action for conversion because he was not entitled to immediate possession of the funds and therefore the decision of the district court was correct, even if for the wrong reason. The district court denied summary judgment on that point on the basis that there appeared to be a genuine issue of material fact regarding that matter. We believe that the district court was correct in that regard. As agent for various individuals, Draemel had a special interest in the money, sufficient to permit him to maintain an action for conversion. In 18 Am. Jur. 2d *Conversion* § 58 at 185 (1985), the author states: "An agent entrusted by his principal with the possession of goods is generally recognized as having a sufficient interest in the goods to enable him to maintain an action against a third person for their conversion." See, also, *Chamberlain v. Woolsey, on rehearing* 66 Neb. 149, 95 N.W. 38 (1903).

For these reasons, therefore, the decision of the district court in granting summary judgment must be reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.