750 F.2d 767
 Blue Sky L. Rep. P 72,170, Fed. Sec. L. Rep. P 91,920
John H. HATROCK, Jr. and Beverly J. Hatrock, husband and
wife, Plaintiffs/Appellees/Cross-Appellants,
v.
EDWARD D. JONES & CO., and Jack Daugherty,
Defendants/Appellants/Cross- Appellees.
 Nos. 83-4182, 83-4190 and 83-4233.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 3, 1984.
Decided Dec. 28, 1984.
 
 Scott W. Reed, Coeur d'Alene, Idaho, for plaintiffs, appellees, cross-appellants.
 Richard A. Riley, Eberle, Berlin, Kading, Turnbow & Gillespie, Kaye Riordan, Elam, Burke, Evans, Boyd & Koontz, Boise, Idaho, for defendants, appellants, cross-appellees.
 Appeal from the United States District Court for the District of Idaho.
 Before CHOY, TANG and SCHROEDER, Circuit Judges.
 CHOY, Circuit Judge:
 
 
 1
 The district court entered judgment upon a jury verdict for the plaintiffs for violating federal securities law and state securities law and common law, and allowed attorneys' fees against one of the defendants. We affirm.
 
 I. BACKGROUND
 
 2
 John and Beverly Hatrock were a young couple with little prior experience in the stock market. Edward D. Jones & Company ("Jones") was a midwest brokerage firm located in Maryland Heights, Missouri. The company identified itself as a "country broker" with a conservative philosophy. It had 530 offices in 32 states, most of which were operated by a single broker. In 1977, Jack Daugherty took over one of those single-broker offices in Coeur d'Alene, Idaho.
 
 
 3
 Around July 1978, the Hatrocks began talking to Daugherty about the purchase of stocks. On February 2, 1979, the Hatrocks opened an account with Jones. During 1979, the Hatrocks purchased and sold various securities, but got out of the market completely when they "got real nervous" about price fluctuations.
 
 
 4
 On August 14, 1980, Daugherty told John Hatrock that Daugherty's "good friend" had advised him that El Paso Company, selling at $21 per share at the time, would be taken over within a month for $32 per share. Daugherty indicated that "the papers were all signed" and that his source invested in the company. On August 15, 1984, Daugherty placed the Hatrocks' order for 4,000 shares of El Paso at $21 per share. The Hatrocks paid cash for 2,000 shares and purchased another 2,000 on margin. To finance the purchase, the Hatrocks obtained a 120-day loan for $42,499.
 
 
 5
 On August 26, 1980, Daugherty told the Hatrocks that his source had informed him that Hoover Company, selling for $17 per share at the time, was going to be taken over at $26 per share. The Hatrocks purchased 600 shares of Hoover stock on margin for $10,350. Daugherty later advised the Hatrocks to sell Hoover and buy more El Paso. The Hatrocks sold their 600 shares of Hoover and purchased another 600 shares of El Paso, investing an additional $1,888.
 
 
 6
 On October 22, 1980, Daugherty told John Hatrock that, according to his source, the pending presidential election had stalled the El Paso buyout, and advised Hatrock to sell the El Paso stock. After the Hatrocks sold their 4,600 shares of El Paso, they had about $113,000 in their account.
 
 
 7
 A few days after the election, Daugherty told John Hatrock that the El Paso takeover would be back on track with the Reagan Administration coming in. On November 6, 1980, the Hatrocks purchased 4,500 shares of El Paso stock at $24 1/4 per share.
 
 
 8
 On November 11, 1980, Daugherty informed the Hatrocks that the Hoover takeover had been finalized and was going to be announced after the close of business on Friday, November 14. John Hatrock authorized the sale of the 4,500 shares of El Paso at a $4,700 loss, and the purchase of 6,500 shares of Hoover at $16 3/4 per share. A few days later, Daugherty told the Hatrocks that the takeover had not occurred because one of the Hoover family members had objected to the price. As the price of Hoover stock slid downward, Daugherty gave the Hatrocks further assurances of a takeover. In December 1980 the Hatrocks had to refinance their loan at 14 1/2%.
 
 
 9
 Jones sent out margin calls, and as a result sold 1,300 shares of the Hatrocks' Hoover stock, leaving them with 5,200 shares with a gross value of $65,972.
 
 
 10
 The Hatrocks filed this action in the United States District Court for the District of Idaho to recover damages under federal and state securities laws, and under the Idaho common law of fraud and misrepresentation. A jury returned a verdict for the Hatrocks against Daugherty and Jones for $36,880 compensatory damages, together with punitive damages of $50,000 against Daugherty and $200,000 against Jones. The district court entered judgment upon the verdict and allowed $12,293.33 attorneys' fees under the state securities laws against Daugherty, but not against Jones. The district court denied the defendants' motions for judgment notwithstanding the verdict and for a new trial.
 
 II. DISCUSSION
 
 11
 A. Jones' Appeal.
 
 
 12
 1. Punitive Damages.
 
 
 13
 Jones challenges the jury's finding in Special Verdict No. 7 that the Hatrocks met their burden of proof "[i]n regard to Defendant Edward D. Jones & Co.'s liability for punitive or exemplary damages under plaintiffs' third claim based upon fraudulent misrepresentations."
 
 
 14
 a. Substantial Evidence to Support Punitive Damages.
 
 
 15
 Jones first argues that "the record contains no substantial evidence supporting an award of punitive damages against Jones, as principal, for the acts of Daugherty, its agent."
 
 
 16
 The Hatrocks may not recover punitive damages for Jones' violation of the Securities Exchange Act of 1934, see Byrnes v. Faulkner, Dawkins & Sullivan, 550 F.2d 1303, 1313 (2d Cir.1977), or for its violation of the Securities Act of 1933. See Hill York Corp. v. American International Franchises, Inc., 448 F.2d 680, 697 (5th Cir.1971). Under Idaho common law, however, a principal may be liable for punitive damages for the acts of its agent upon "a clear showing that the agent had managerial status or that the principal ordered or ratified the acts in question." Hatfield v. Max Rouse & Sons Northwest, 100 Idaho 840, 853, 606 P.2d 944, 957 (1980) (citations omitted); see Barlow v. International Harvester Co., 95 Idaho 881, 897-98, 522 P.2d 1102, 1118-19 (1974); Openshaw v. Oregon Automobile Insurance Co., 94 Idaho 335, 338, 487 P.2d 929, 932 (1971). The burden of making the showing rests on the plaintiff. Hatfield, 100 Idaho at 854, 606 P.2d at 958. Idaho courts allow punitive damage awards "to deter owners and managing officers from tolerating misconduct by employees." Boise Dodge, Inc. v. Clark, 92 Idaho 902, 906, 453 P.2d 551, 555 (1969) (quoting Note, Exemplary Damages in the Law of Torts, 70 Harv.L.Rev. 517, 526 (1957)).
 
 
 17
 The district court modeled its punitive damages instruction after the Restatement (Second) of Torts Sec. 909 (1977). Section 909 states:
 
 
 18
 Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if, (a) the principal or a managerial agent authorized the doing and the manner of the act, or (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the principal or a managerial agent of the principal ratified or approved the act.
 
 
 19
 The Supreme Court of Idaho has cited this section with approval. See Hatfield, 100 Idaho at 854, 606 P.2d at 958; Barlow, 95 Idaho at 898, 522 P.2d at 1119; Openshaw, 94 Idaho at 338, 487 P.2d at 932.
 
 
 20
 Following these rules and Restatement principles, the district court properly instructed the jury that:
 
 
 21
 Punitive damages can properly be awarded against Defendant Edward D. Jones & Co. as principal because of an act or acts of Defendant Daugherty as made known to plaintiff if, and only if:
 
 
 22
 1. Edward D. Jones & Co. authorized the doing and the manner of the act; or
 
 
 23
 2. Defendant Daugherty was unfit and Defendant Edward D. Jones was reckless in employing him; or
 
 
 24
 3. Defendant Daugherty was employed in a managerial capacity and was acting in the scope of his employment; or
 
 
 25
 4. Edward D. Jones & Co., or a managerial agent of Edward D. Jones & Co., ratified or approved the act.
 
 
 26
 We affirm the jury's award of punitive damages because there was substantial evidence that Jones employed Daugherty in a managerial capacity and that Daugherty acted in the scope of his employment.[1] Although Daugherty was only a limited partner in Jones and was not licensed as a branch manager, Daugherty had management authority. Jones identified Daugherty as a branch manager. With the knowledge and approval of Jones, Daugherty held himself out to the public as a manager.
 
 
 27
 Moreover, in practice, Jones required Daugherty to take a management role. Jones had more than 500 field offices typically operated by a single broker. Jones gave each broker occupying these offices complete authority to act in a managerial capacity in all matters relating to dealings with customers.
 
 
 28
 Jones, therefore, in effect authorized Daugherty to conduct business as branch manager. The jury properly assessed punitive damages against Jones for the fraudulent misrepresentations of its de facto manager, Daugherty. See Barlow v. International Harvester Co., 95 Idaho 881, 898, 522 P.2d 1102, 1119 (1974). The punitive damages will deter Jones and those similarly situated from placing unqualified individuals in management positions, and would encourage closer control over employees. See Boise Dodge, 92 Idaho at 906, 453 P.2d at 555; Restatement (Second) of Torts Sec. 909, comment b. (1977).
 
 
 29
 b. Jones' Good Faith Defense.
 
 
 30
 Jones argues that as a matter of Idaho law, good faith precludes any punitive damage award against it based on inadequate supervision. It argues that the Idaho "controlling person" statute permits a good faith defense, and that the jury's Special Verdict No. 3 necessarily includes a finding that Jones acted in good faith.
 
 
 31
 The district court properly rejected this argument. The jury did not award punitive damages under Idaho's "controlling person" statute. Rather, it assessed punitive damages for Daugherty's common law fraudulent misrepresentations, and for Jones' vicarious liability for that fraud. The jury imposed punitive damages on Jones solely for employing Daugherty in a managerial capacity while Daugherty committed the wrongful acts. This imposition of liability did not hinge upon Jones' lack of good faith. Jones, therefore, could not assert its good faith as a defense to the Hatrocks' common law claim for punitive damages.
 
 
 32
 c. Amount of Punitive Damages.
 
 
 33
 The jury awarded $50,000 in punitive damages against Daugherty and $200,000 against Jones. Jones contends that the $200,000 was excessive, and that a new trial therefore should be granted.
 
 
 34
 We give the trial judge and jury wide discretion in assessing punitive damages. See Cheney v. Palos Verdes Investment Corp., 104 Idaho 897, 904, 665 P.2d 661, 668 (1983). In reviewing awards of punitive damages, Idaho courts require "some reasonable relationship between the amount of compensatory damages awarded and the amount of the punitive damage award that will be sustained when attacked for being excessive." Yacht Club Sales & Service, Inc. v. First National Bank of North Idaho, 101 Idaho 852, 864, 623 P.2d 464, 476 (1980).
 
 
 35
 Courts also consider whether the punitive damages are so disproportionate to the damages sustained as to be the result of passion or prejudice. Neal v. Farmers Insurance Exchange, 21 Cal.3d 910, 928, 148 Cal.Rptr. 389, 399, 582 P.2d 980, 990 (1978); Williams v. Bone, 74 Idaho 185, 188, 259 P.2d 810, 813 (1953). One factor in assessing proportionality is the reprehensibility of the defendant's conduct. Neal, 21 Cal.3d at 928, 148 Cal.Rptr. at 399, 582 P.2d at 990.
 
 
 36
 "Also relevant is the prospective deterrent effect of such an award upon persons situated similarly to the defendant." Boise Dodge, 92 Idaho at 908, 453 P.2d at 557. In measuring the deterrent effect of the award on the defendant, we should consider the defendant's wealth. Deterrence "will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort." Neal, 21 Cal.3d at 928, 148 Cal.Rptr. at 399, 582 P.2d at 990.
 
 
 37
 The jury's award of $250,000 in punitive damages is not excessive. The jury found the defendants jointly and severally liable for $36,880 in compensatory damages. The approximate 7 to 1 ratio of punitive damages to compensatory damages is reasonable and within the proportions allowed under Idaho law. See Boise Dodge, 92 Idaho at 907-09, 453 P.2d at 556-58 (36 to 1 ratio reasonable).[2]
 
 
 38
 In addition, Jones' great wealth supports the jury's award. Jones' gross revenue in fiscal 1981 was $60,000,000 and its net capital was $7,360,275. The punitive damages award represents only one-third of one percent of Jones' gross revenues, and less than three percent of its net capital. The award, therefore, does not impose more liability than necessary to deter Jones from undesirable behavior.[3] See Neal, 21 Cal.3d at 929, 148 Cal.Rptr. at 400, 582 P.2d at 991 ("less than one-tenth of 1 percent of defendant's gross assets" not excessive); Roemer v. Retail Credit Co., 44 Cal.App.3d 926, 937, 119 Cal.Rptr. 82, 89 (Cal.Ct.App.1975) (six-tenths of 1 percent of defendant's net worth not excessive).
 
 
 39
 2. Compensatory Damages.
 
 
 40
 a. Causation.
 
 
 41
 Jones contends that Daugherty's fraud was not the proximate cause of the Hatrocks' losses. Jones also complains that the district court failed to instruct the jury on loss causation.
 
 
 42
 It is true that in an action brought under Rule 10b-5 for material omissions or misstatements, the plaintiff must prove both transaction causation, that the violations in question caused the plaintiff to engage in the transaction, and loss causation, that the misrepresentations or omissions caused the harm. See Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374, 380 (2d Cir.1974), cert. denied, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). The plaintiff, however, should not have to prove loss causation where the evil is not the price the investor paid for a security, but the broker's fraudulent inducement of the investor to purchase the security. See Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1173 (2d Cir.1970).
 
 
 43
 Therefore, when a securities broker engages in excessive trading in disregard of his customer's investment objectives for the purpose of generating commission business, the customer may hold the broker liable for churning without proving loss causation. See Mihara v. Dean Witter & Co., 619 F.2d 814, 820-21 (9th Cir.1980); Rolf v. Blyth Eastman Dillon & Co., Inc., 424 F.Supp. 1021, 1039 (S.D.N.Y.1977), aff'd and remanded, 570 F.2d 38 (2d Cir.), cert. denied, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).[4] The investor may recover excessive commissions charged by the broker, and the decline in value of the investor's portfolio resulting from the broker's fraudulent transactions.[5] See Miley v. Oppenheimer & Co., 637 F.2d 318, 326-27 (5th Cir.1981). The recoverable decline in portfolio value is "the difference between what [the plaintiff] would have had if the account ha[d] been handled legitimately and what he in fact had at the time the violation ended." Id. at 327. The finder of fact "must be afforded significant discretion to choose the indicia by which such an estimation is made, based primarily on the types of securities comprising the portfolio." Id. at 328 (footnote omitted).
 
 
 44
 Substantial evidence supports the jury's award of $36,880 in compensatory damages. In churning cases, where exact measurements of damages are precluded by the wrongful acts, the jury's award need only be a fair approximation of actual damages. See Miley, 637 F.2d at 328 (quoting Fey v. Walston & Co., 493 F.2d 1036, 1055 (7th Cir.1974)). Here, the award was short of the Hatrocks' total claim. The evidence showed that the Hatrocks paid Jones $10,701 in interest and commissions in connection with the wrongful transactions. In addition, the evidence showed that Daugherty wrongfully induced the Hatrocks to buy Hoover stock on November 11, 1980 for $109,146. The Hatrocks netted $79,263 from the sale of this Hoover stock, for a loss of $29,883. The Hatrocks, therefore, showed that they were damaged in the total amount of $40,584, which is more than the jury's actual award. The jury's award was a "fair approximation" of the Hatrocks' damages.
 
 
 45
 b. Instructions on Mitigation.
 
 
 46
 Jones next argues that the district court failed to submit to the jury a special interrogatory on mitigation. The proposed instruction would have required the jury to state the date on which the plaintiffs first learned of or had reason to know of the misrepresentations or churning.
 
 
 47
 The district court did not err in rejecting this proposed instruction. Although Jones' instruction might have provided the jury more guidance, the court did not commit reversible error in rejecting the instruction. "A failure to give a requested instruction is not reversible error so long as the trial judge gives adequate instructions on each element of the case." Van Cleef v. Aeroflex Corp., 657 F.2d 1094, 1098-99 (9th Cir.1981). The judge "need not incorporate every proposition of law suggested by counsel so long as he adequately covers the principles necessary for jury guidance." Id. at 1099.
 
 
 48
 Here, the trial judge gave adequate instructions on mitigation. Jones concedes that the district court "properly instructed that plaintiffs are required to mitigate their damages." This is not a case where the judge gave the jury confusing and inconsistent instructions on a material issue. See Northern Pacific Railway v. Herman, 478 F.2d 1167, 1171 (9th Cir.1973).
 
 
 49
 B. Daugherty's Appeal.
 
 
 50
 1. Liability for Conveyance of Rumors.
 
 
 51
 Daugherty argues that the jury improperly found him liable under state and federal securities laws for the conveyance of rumor. Although brokers are not liable for the conveyance of rumor as such, see Ruszkowski v. Hugh Johnson & Co., 302 F.Supp. 1371, 1376 (W.D.N.Y.1969), their representation of rumor as verified fact may violate state and federal securities laws as a misrepresentation of material fact. Here, substantial evidence supports the jury's finding that Daugherty fraudulently misrepresented rumor as verified fact.
 
 
 52
 On August 26, 1980, Daugherty informed Hatrock that his source had told him that Hoover Company, selling for $17 per share at the time, was going to be bought out for $26 per share. On November 11, 1980, Daugherty told Hatrock that his source had told him that the Hoover takeover had been finalized and was going to be announced on November 14, 1980. Daugherty called his source in John Hatrock's presence to confirm the buyout. In reliance on that representation, the Hatrocks purchased Hoover stock. Daugherty testified that the information he passed on to the Hatrocks on Hoover stock "was the most detailed and specific information" he had ever heard. The specificity of the information Daugherty had given the Hatrocks and the manner of its communication support Daugherty's liability under federal and state securities laws for misrepresenting rumor as verified fact.
 
 
 53
 Daugherty next argues that the jury was not adequately instructed on the difference between the conveyance of rumor, which is not a violation of securities laws, and the conveyance of rumor as verified fact, which is a violation. Both sides, however, heavily argued the question, and the jury could reasonably understand the difference without Daugherty's proposed instructions. The trial court's general instructions on federal and state securities laws violations were adequate.
 
 
 54
 2. Proof of Churning.
 
 
 55
 Daugherty argues that the Hatrocks did not establish, by a preponderance of the evidence, all the elements of a cause of action for churning.
 
 
 56
 To establish a claim of churning, a plaintiff must show (1) that the trading in his account was excessive in light of his investment objectives; (2) that the broker in question exercised control over the trading in the account; and (3) that the broker acted with intent to defraud or with willful and reckless disregard for the interests of his client. Mihara v. Dean Witter & Co., 619 F.2d 814, 821 (9th Cir.1980).
 
 
 57
 The Hatrocks established each of these elements. Daugherty's trading on the Hatrocks' account was excessive. In the final three months, Daugherty rolled over the Hatrocks' initial investment six to seven times. These transactions constituted churning according to the Hatrocks' expert witness, a retired broker with 21 years of experience working for three national brokerage firms.
 
 
 58
 The evidence also showed that Daugherty exercised control over the Hatrocks' account. The Hatrocks were unsophisticated investors and largely relied on Daugherty's investment advice. The evidence showed that Daugherty strongly recommended certain purchases and sales and that the Hatrocks inevitably followed his advice.
 
 
 59
 Finally, the evidence showed that Daugherty knew or should have known that the information obtained from his source on the Hoover takeover was not verified fact, but rumor. Yet, Daugherty conveyed the information to the Hatrocks as if it were fact. With knowledge that the Hatrocks were unsophisticated investors and would probably accept the information at face value, Daugherty acted willfully and in reckless disregard for the Hatrocks' interests. See Mihara, 619 F.2d at 821.[6]
 
 
 60
 3. Causation of Compensatory Damages.
 
 
 61
 Daugherty argues that the Hatrocks failed to show that his conduct caused the decline in value of Hoover stock. We reject this argument because, as discussed with respect to Jones' appeal, the plaintiff in churning cases need not prove loss causation. Proof of transaction causation suffices.[7]
 
 
 62
 4. Punitive Damages.
 
 
 63
 Daugherty argues that the jury should not have assessed punitive damages against him because his conduct was not an extreme deviation from reasonable standards of conduct.
 
 
 64
 Under Idaho law, we may sustain an award of punitive damages on appeal when the plaintiff has shown that (1) the defendant acted in a manner that was an extreme deviation from reasonable standards of conduct, and (2) the defendant acted with an understanding of or disregard for the likely consequences of his action. Cheney v. Palos Verdes Investment Corp., 104 Idaho 897, 905, 665 P.2d 661, 669 (1983). The defendant must have acted with an extremely harmful state of mind, whether that state be termed "malice, oppression, fraud or gross negligence." Id.
 
 
 65
 The evidence showed that Daugherty's conduct was an extreme deviation from reasonable standards of conduct. His excessive trading and his misrepresentation of rumor as verified fact was an extreme deviation from reasonable broker conduct. Although Daugherty may be correct that "rumor plays a great part in the securities marketplace," his misrepresentation of rumor as fact and his excessive trading on the Hatrocks' account was not acceptable behavior.
 
 
 66
 The evidence also showed that Daugherty acted fraudulently and with a disregard for the likely consequences of his conduct. Daugherty knew that the Hatrocks were unsophisticated investors, yet convinced them to invest in Hoover stock by misrepresenting rumor as verified fact. His flagrant disregard of the Hatrocks' need to minimize investment risk and commissions evidenced an extremely harmful state of mind.
 
 
 67
 5. Attorneys' Fees.
 
 
 68
 The district court awarded attorneys' fees against Daugherty under section 30-1446 of the Idaho Code, which permits the Hatrocks "to sue at law or in equity to recover the consideration paid for the security, together with interest at six per cent (6%) per annum from the date of payment, costs, and reasonable attorneys' fees ...."
 
 
 69
 Daugherty contends that the court should have submitted the attorneys' fees question to the jury because the Hatrocks brought their claim for attorneys' fees at law. Daugherty's reasoning, however, is flawed. The mere inclusion of reasonable attorneys' fees in section 30-1446 as an item of recovery does not mean that the subject of attorneys' fees should have been submitted to the jury as a question at law. The allowance and amount of attorneys' fees is not a jury question, but is within the sound discretion of the trial judge. See State Farm Fire and Casualty Co. v. McFerrin, 382 F.2d 282, 283 (5th Cir.1967), cert. denied, 390 U.S. 953, 88 S.Ct. 1045, 19 L.Ed.2d 1145 (1968); Dustin v. Beckstrand, 103 Idaho 780, 786, 654 P.2d 368, 374 (1982) ("[t]he allowance and amount of attorney's fees is not a jury question").
 
 
 70
 C. Hatrocks' Cross-Appeal.
 
 
 71
 The Hatrocks argue that the district court should have awarded them attorneys' fees against Jones. We affirm the district court's denial because the Hatrocks have been fully compensated for their attorneys' fees claim.
 
 
 72
 Under their agreement for payment of legal fees, the Hatrocks were liable for "33 percent of any money or property paid, received or collected by action, compromise or otherwise, upon or in satisfaction or settlement of said claim or any judgment obtained thereon." The district court awarded the Hatrocks $12,293.33 in legal fees, exactly "33 percent" of the $36,880 the Hatrocks received in compensatory damages.
 
 
 73
 Moreover, the Hatrocks may recover attorneys' fees from Jones under section 30-1446 of the Idaho Code only if they prove that Jones was a controlling person under that section. Under Idaho common law, the jury found Jones vicariously liable for Daugherty's fraudulent misrepresentations, but found him innocent of federal or state securities law violations, including controlling person liability.
 
 
 74
 Finally, the Hatrocks argue that, in the alternative, Jones may be liable for attorneys' fees under the doctrine of respondeat superior. Although some courts view the doctrine as an alternate remedy, this court has firmly held that controlling person liability under the federal statutes supplants liability under respondeat superior. Christoffel v. E.F. Hutton & Co., 588 F.2d 665, 667 (9th Cir.1978); Zweig v. Hearst Corp., 521 F.2d 1129, 1132-33 (9th Cir.), cert. denied, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); Kamen & Co. v. Paul H. Aschkar & Co., 382 F.2d 689, 697 (9th Cir.1967), cert. granted, 390 U.S. 942, 88 S.Ct. 1021, 19 L.Ed.2d 1129 (1968), cert. dismissed, 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1969).[8] The Hatrocks, therefore, may not recover attorneys' fees under this alternate theory.
 
 
 75
 AFFIRMED, with costs to the Hatrocks.
 
 
 
 [1]
 We need not address the Hatrocks' further contentions that Jones authorized or ratified the fraudulent conduct, or that Daugherty was unfit and Jones was reckless in employing him
 
 
 [2]
 Although some courts have stricken lower percentages of punitive damages as excessive, see Williams v. Bone, 74 Idaho 185, 188, 259 P.2d 810, 813 (1953) (3 1/2 to 1 ratio excessive); Driesbach v. Lynch, 74 Idaho 225, 229-30, 259 P.2d 1039, 1043-44 (1953) (3 to 1 ratio excessive), these
 cases have little precedential value when excised from their respective factual settings. This is true because the culpability of a defendant's conduct and the sociological significance of damages as a deterrent vary from case to case. Thus, the true basis for an award of one amount of punitive damages as opposed to another amount lies in an overall appraisal of the circumstances of the case.
 Boise Dodge, 92 Idaho at 908, 453 P.2d at 557.
 
 
 [3]
 Jones wrongly argues that because the jury found that Jones properly supervised its employees, the punitive damages would serve no deterrent purpose. The basis for the award against Jones was its placement of Daugherty in a management position. The purpose of permitting punitive damages in this situation is to deter companies from placing incompetent employees in management positions. Even though the Hatrocks did not prove Daugherty unfit, the punitive damages serve to encourage Jones and others similarly situated to place highly qualified individuals in those positions to avoid punitive damages liability
 
 
 [4]
 Jones argues that we must apply the "out-of-pocket" rule, and award the Hatrocks only those losses that were reasonably foreseeable consequences of the misrepresentations, and only if the misrepresentation touches upon the reasons for the investment's decline in value. The cases Jones relies upon, however, are not churning cases and therefore not controlling here. See Huddleston v. Herman and MacLean, 640 F.2d 534, 549-50 (5th Cir.1981), rev'd in part, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); Arrington v. Merrill Lynch, Pierce, Fenner and Smith, 651 F.2d 615, 621 (9th Cir.1981); Foster v. Financial Technology, Inc., 517 F.2d 1068, 1071 (9th Cir.1975). Moreover, even in these non-churning cases, the district court has the discretion to apply a rescissory measure of damages in appropriate circumstances. Arrington, 651 F.2d at 621; Blackie v. Barrack, 524 F.2d 891, 909 (9th Cir.1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976)
 
 
 [5]
 Jones argues that the district court failed to instruct the jury on loss causation and that its damages instruction caused prejudicial error. Because loss causation need not be proven in churning cases, the court did not err in refusing to give the jury Jones' requested instruction
 
 
 [6]
 Daugherty erroneously states that the Hatrocks must show that he acted with "an intent to deceive, manipulate or defraud." In churning cases, we have held that the plaintiff may prove scienter by showing that a broker acted recklessly. Mihara, 619 F.2d at 821
 
 
 [7]
 Daugherty further complains that $6,000 of dividends received by the Hatrocks from Hoover and El Paso stocks was not deducted from the damages award, so that a remittitur of the dividends is necessary. In their claim, however, the Hatrocks did take into account dividends received, and the jury considered these dividends. Daugherty makes no contrary showing
 
 
 [8]
 The Hatrocks request that we reconsider our holdings in Christoffel, Zweig, and Kamen. We have, however, already denied this request in Christoffel, stating that "[o]ur Circuit has a long-standing rule that law declared by one panel of the court cannot be overruled except by the court sitting en banc." 588 F.2d at 667