**COMMUNITY HOSPITAL OF SPRING-
FIELD AND CLARK COUNTY, INC.,
et al., Plaintiffs,**

v.

**KIDDER, PEABODY & CO.
INC., et al., Defendants.**

**No. C2–98–1138.**

United States District Court,
S.D. Ohio,
Eastern Division.

Nov. 10, 1999.

Philip Albert Brown, Vorys, Sater, Seymour & Pease, Columbus, OH, Jerry M. Santangelo, Neal Gerber & Eisenberg, Bruce Samuel Sperling, Sperling Slater & Spitz, Chicago, IL, for Plaintiffs.

Daniel William Costello, Porter Wright Morris & Arthur, Jeffrey S. Sutton, Jones Day Reavis & Pogue, Columbus, OH, Gregory J. Wallance, Kaye Scholer Fierman Hays & Handler, New York City, for Defendants.

## MEMORANDUM OPINION AND ORDER

GRAHAM, District Judge.

This is an action to confirm an arbitration award pursuant to § 9 of the Federal Arbitration Act, 9 U.S.C. § 9. The arbitration was conducted under the auspices of the National Association of Security Dealers, Inc. ("NASD"). The plaintiffs are the Community Hospital of Springfield and Clark County, Inc. ("Hospital"), a not-for-profit hospital organized under the laws of the state of Ohio; Community Hospital Retirement Plan, the hospital's ERISA qualified pension plan; Clark County Dialysis Facility, Inc., a not-for-profit dialysis facility; and various individuals who are the trustees of the hospital and its retirement plan. The plaintiffs are sometimes referred to herein collectively as "the Hospital". The defendants are Kidder, Peabody & Co., Inc. ("Kidder"), a national securities brokerage firm, and its former Senior Vice President, David A. Beale.

Plaintiffs initiated an arbitration proceeding in December, 1995, under the arbitration rules of the NASD, alleging that Kidder and Beale breached their duties as securities professionals, violated federal and state securities laws, and committed fraud in connection with the recommendation and sale of securities to the plaintiffs. On October 16, 1998, after nineteen days of hearings, a panel of three arbitrators appointed by the NASD, which consisted of two securities lawyers and a member of the securities, industry, rendered a decision and award in favor of the plaintiffs, awarding them the sum of $17 million in compensatory damages and $4.5 million in punitive damages against both defendants, jointly and severally. Plaintiffs commenced this action on November 10, 1998. Thereafter, on November 16, 1998, Kidder paid the plaintiffs $10.8 million and filed a cross-petition to partially vacate the award, pursuant to § 10 of the Federal Arbitration Act, 9 U.S.C. § 10, alleging that $6.2 million of the compensatory damage award and the $4.5 million punitive damage award were improper. This matter is now before the court on the parties' cross-motions for summary judgment.

A federal court may set aside an arbitration award only where certain statutory or judicially-created grounds are present. Here, defendants rely on a judicially-created ground for vacating an award when it was made "in manifest disregard of the law." See Wilko v. Swan,

346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). Manifest disregard of the law is a very narrow standard of review. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros,* 70 F.3d 418, 421 (6th Cir.1995) (citing *Anaconda Co. v. District Lodge No. 27,* 693 F.2d 35 (6th Cir.1982)). A mere error in interpretation or application of the law is insufficient. *Id.* (citing *Anaconda,* 693 F.2d at 37–38). The decision must fly in the face of clearly established legal precedent. In *Jaros,* the court said:

> When faced with questions of law, an arbitration panel does not act in manifest disregard of the law unless (1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle.

*Id.* at 421.

Here, although the arbitrators explained the contentions of the parties in considerable detail, they did not specifically set forth the reasons for their award, nor did they explain how they resolved any questions of law. They are not required to do so. In such a case, a party seeking to have the award set aside faces a "tremendous obstacle." *Id.* at 421. "Only where no judge or group of judges could conceivably come to the same determination as the arbitrators must the award be set aside." *Id.* (citing *Storer Broadcasting Co. v. American Fed'n of Television and Radio Artists,* 600 F.2d 45 (6th Cir.1979); *Ainsworth v. Skurnick,* 960 F.2d 939, 941 (11th Cir.1992), *cert. denied,* 507 U.S. 915, 113 S.Ct. 1269, 122 L.Ed.2d 665 (1993)).

Plaintiffs' claims arose out of their purchase of collateralized mortgage obligations ("CMOs"); specifically, an esoteric version of these securities known as "inverse floaters". CMOs are typically created by national securities firms from a pool of mortgage loans issued by governmental agencies such as the Federal Home Loan Mortgage Corporation. The cash flow from the underlying loans is redirected into different types of bonds which are then sold to investors. In the case of inverse floaters, the interest rate of the bond moves in the opposite direction of market interest rates. The value and liquidity of the bond is affected by the prepayment rates of the underlying collateral, which can change radically on swings in interest rates. If market interest rates rise, mortgage prepayments tend to decline, the time within which the bond will be paid lengthens, and the interest rate falls. As a result, the investor in inverse floaters will receive lower interest payments over a longer period of time and this can cause a substantial decline in the market value and liquidity of the bond.

In the arbitration proceeding, plaintiffs produced evidence that inverse floaters are extremely volatile, risky, and easily misunderstood. The NASD has repeatedly told its members, including Kidder, that such securities are not suitable for most investors and should not be recommended or sold except to the most sophisticated investors who have a high-risk profile. The NASD was concerned that unscrupulous brokers could deceptively sell inverse floaters as safe and conservative investments by emphasizing that the principal and interest payments are guaranteed by agencies of the United States government. According to the plaintiffs' evidence, only the most sophisticated investors utilizing specially designed computer programs could truly understand and intelligently analyze the risk of investing in inverse floaters. When interest rates increase, an inverse floater could quickly lose up to seventy percent of its face value. Once a rise in interest rates has altered the prepayment and cash flow characteristics of the mortgage pool, these securities may never regain their former value or liquidity, even if interest rates should again decline. Plaintiffs' expert, Norman Frager, testified that those knowledgeable in the securities industry have referred to these kinds of securities as "toxic material and nuclear waste." 2 AR 25, p. 108.

The hospital historically placed its investment funds in savings accounts in local

banks and in United States government T-bills and other government bonds. The hospital's written investment policy requires all funds to be invested so as to preserve principal and maintain liquidity. The hospital's funds were invested by its Chief Financial Officer, Richard Foster. In 1985, Foster, acting for the hospital, purchased some government bonds from defendant Beale, who was then employed by a firm in Houston, Texas, which sold unregistered securities. Beale cultivated a relationship with Foster which permitted him to develop the hospital as a client. In 1990, Beale became employed as a bond salesman in the Houston office of Prudential Bache. Here, in addition to traditional bonds, he began selling inverse floaters. Beale's commission for selling an inverse floater was about one hundred times greater than the commission for selling a U.S. treasury bond of like amount because the risk of the investment was so much greater and they were much more difficult to sell.

By the early 1990s, Beale had gained Foster's trust and he presented inverse floaters to Foster as a suitable investment for the hospital. Foster began buying inverse floaters, believing that they were only slightly more risky than T-bills. Beale quickly became one of the highest producers at Prudential based on his sales of inverse floaters to the hospital. During 1991 and 1992, interest rates remained relatively stable or declined. As a result, the inverse floaters Beale was selling to the hospital increased in value. Ultimately, however, Prudential determined that inverse floaters were not a suitable investment for the hospital and instructed its Houston office to cease selling them to the hospital. Beale did not reveal this to Foster. Instead, he told Foster that Prudential could no longer supply the product but that he could obtain it through another brokerage firm, The Trading Desk ("TDI"). Later, Beale was able to resume selling Prudential's inverse floaters to the hospital after he persuaded Foster to procure a revision to the hospital's written investment policy by telling him that it was out of date because it was written before inverse floaters existed, and that they should now be added to the list of conservative investments identified in the policy. By the spring of 1993, Beale had persuaded Foster to invest almost all of the hospital's investment portfolio in inverse floaters.

In May 1993, Kidder recruited Beale to join its Houston office. Before hiring Beale, Thad Bowman, the head of Kidder's Houston office, reviewed his business with the hospital. Beale showed Bowman a detailed breakdown of the investment portfolio he had recommended and sold to the hospital, which was then comprised of $18 million worth of inverse floaters. Bowman learned that over eighty-five percent of Beale's commissions came from selling inverse floaters to the hospital. Kidder flew Beale to New York to meet the chairman and president of Kidder. Beale received a $168,000.00 signing bonus and a special commission rate. During his negotiations with Kidder, Beale committed the hospital to a substantial trade of inverse floaters which was timed to occur the first day he was on the job. This transaction involved the sale of a substantial portion of the hospital's portfolio of inverse floaters to be replaced by $12 million worth of inverse floaters to be purchased from Kidder. This transaction made no economic sense for the hospital. Its portfolio was not changed in any meaningful way, but the transaction generated substantial commissions and profits for Beale and Kidder.

Throughout July, August, September, and October 1993, Beale continued to recommend to the hospital that it spend every available investment dollar on inverse floaters, and the hospital continued to follow his recommendations. In September 1993, Kidder paid Beale a special bonus of $95,-000.00 to reward him for the high volume of commissions and profits he generated on these sales.

Plaintiffs' expert witness, Norman Frager ("Frager"), a former member of the NASD Board of Governors was well qualified to testify on the customs and practices of the securities industry. Frager has over thirty years of experience in the securities industry, including experience as an accounting officer, operations officer, compliance officer, and president of a securities firm where he supervised an operating staff of over one hundred people. His experience has included supervising brokers, dealing with customer complaints, participating in regulatory audits, and acting as the financial and operations principal of several securities firms. Frager has served the industry in a variety of capacities. He served as chairman of an NASD District Business Conduct Committee, which covered six states. After that, he served in various capacities at the national level. In addition to his service as a member of the Board of Governors, he served as chairman of the NASD Operations Committee, as a member of the finance committee and the executive committee, and as chairman of the audit committee. He has served as an NASD hearing officer and as a member and vice-chairman of the national NASD Business Conduct Committee which functions as an appeals board for complaints brought anywhere in the country. In this capacity, Frager heard over 2,000 cases. The arbitration panel accepted Frager as an expert in the customs and practices of the securities industry, including specifically the following subjects: 1) the duties of brokers and their firms to determine the suitability of investments recommended to a client; 2) disclosure obligations applicable to sellers of securities and their brokerage firms; 3) the duty of brokerage firms to ensure compliance with NASD rules and regulations; 4) churning; 5) excess markups; and 6) the duty of a brokerage firm to supervise the activities of its sales force.

Frager described NASD requirements for the establishment of a new account. These include obtaining information about the client's investment objectives and, in the case of an organizational client, obtaining proof of the authority of the individual or individuals who will be placing orders. This information must be obtained before any securities transactions are conducted. Frager testified that his review of the Kidder documents revealed that the new account application it obtained from the hospital disclosed that the hospital's investment objectives were taxable income and long-term growth. The application form contained boxes to check if the investment objectives included aggressive growth or speculation. Neither of these boxes were checked. The new account information Kidder obtained from the hospital included a copy of its written investment policies and a corporate resolution which granted authority to certain officers to purchase securities, but specifically limited their authority to actions which were in compliance with the hospital's investment policy. These materials were provided to Kidder at or about the time the hospital's account was opened on July 21, 1993. However, six weeks prior to the opening of the account, on June 11, 1993, Kidder time-stamped trading tickets for a large order of inverse floaters which essentially replaced the hospital's existing investment portfolio. According to Frager, this was in direct violation of NASD's rules which forbid a firm from recommending or selling securities until all of the required new account information has been obtained and a suitability determination has been made. Frager noted that, not only did the hospital not yet have an account with Kidder, but the registered salesman who executed the order was not yet employed by Kidder. Frager said he had never seen anything like this in his thirty years in the industry.

On July 30, 1993, a little over a week after the hospital's account at Kidder had been opened, Kidder's legal department determined that the hospital's trading resolution, which had been submitted for its approval, was not acceptable. One of the reasons given was that the policy would

require Kidder to examine each trade to determine whether it was in compliance with the hospital's investment policy. Kidder did not inform the hospital's board that it had rejected its trading authorization and would not abide by its limitations. Instead, Kidder sent Foster a document entitled: Certificate of Authority of Governmental Entity To Do Business With Kidder, Peabody & Co., Inc., wherein Foster himself certified that he had the authority to invest in various kinds of securities, including CMOs and derivative mortgage securities. This document did not require ratification by the hospital's board. Approximately one year later, on June 14, 1994, a report of a compliance audit of Kidder's Houston office revealed that another individual in Kidder's New York legal office advised the auditor that the hospital's account opening documents, including its trading resolution, should be "returned to the respective clients with a cover letter which indicates they have not been read, and the customer is responsible for following the investment guidelines as the account is not being handled on a discretionary basis." 2 AR 25, p. 89. When asked if he had an opinion as to whether this complied with NASD policies, Frager said:

It's astounding to me, because obviously having read the letter, where the person in New York says, "I've read them. Send them back to the hospital. Tell them we cannot comply," and a year later someone comes along and says, "Write them a letter saying we haven't read them, and we can't comply with it." I don't understand what's going on. I just don't.

*Id.*, p. 90.

On the issue of suitability, Frager quoted from Kidder's own Compliance Manual, which states:

The suitability of a transaction for a particular customer is an indispensable element in the process of making securities transaction recommendations.... Registered representatives should rec-

ommend only those security transactions to a customer that the registered representative has reasonable grounds to believe are suitable for that customer.

2 AR 25, pp. 97, 98. According to Frager, these requirements are mandated by Section 2, Article III, of the NASD Rules of Fair Practice. Frager testified that, in his opinion, the hospital was not a suitable candidate for the products Beale sold it. In his opinion, the hospital was not a high risk investor and the recommendation of inverse floaters was entirely inappropriate. In his opinion, the hospital was an unsophisticated purchaser which was unable to independently evaluate the risks associated with this kind of investment. In Frager's opinion, inverse floaters were not a suitable investment for a small not-for-profit hospital. He said that in thirty years, he had never seen this type of product in the portfolio of any hospital. Frager pointed out that the hospital's investment policy specifically listed twelve or thirteen kinds of investment vehicles, and that although inverse floaters were included in the list, they were incongruous with the other investments contained in the list. In his opinion, any investment professional would have realized that inverse floaters were inconsistent with the underlying investment objectives specifically set forth in the hospital's statement of investment policy. *Id.* at pp. 126, 130, 131. Frager was asked to sum up his opinion about the suitability of Kidder's sale of inverse floaters to the hospital:

Q. Did you have any question in your mind at all about the suitability—Is this a close issue or not a close issue in your mind?

A. This is not even close. This is off the wall.

*Id.* at pp. 131–132.

Frager defined "churning" as excess trading in a customer's account to benefit the broker and not the client. It is a violation of the NASD Rules of Fair Practice. Frager testified that two formulas

are routinely used to determine whether or not churning has occurred. One is the annualized turnover ratio. Frager performed this analysis on the Kidder trades for the period July 21, 1993 through October 21, 1993. He found that there were a total of $70 million in purchases during this three-month period, during which the average investment value of the account was $29.6 million. The turnover rate for the three-month period was 2.37. On an annualized basis, the rate would be 9.46. According to Frager, an annualized turnover rate of 4 is presumptive evidence of churning and an annualized rate of 6 is conclusive proof of churning. These ratios apply to equity accounts. The ratio for fixed income accounts should be much lower, inasmuch as there should be little or no trading in a fixed income account. According to Frager, churning is considered a fraudulent act in the securities industry.

The second formula for determining whether churning has occurred is the cost-equity ratio. This is the percentage of return necessary to pay the commissions and expenses incurred in connection with the trades. According to Frager, the cost-equity ratio for these trades on an annualized basis was sixty-one percent. In other words, to justify this volume of trading, the hospital would have to earn a sixty-one percent annualized return on its investments. According to Frager, this is not achievable and it is impossible to rationalize this level of trading. According to Frager, the hospital earned only $140,000.00 on these trades while Beale received over seven times that amount in commissions. When asked whether he had ever seen such a situation, Frager responded:

In 30 years, I think this is the most outrageous thing I have ever seen in my life. In 30 years. I am sorry.

2 AR 25, p. 151.

Frager performed an analysis of Kidder's markups on the inverse floaters sold to the hospital. According to Frager, the NASD guidelines limit the markup a firm may add to the cost of a security to five percent. According to Frager, an undisclosed markup in excess of ten percent is fraudulent and excessive. When Frager analyzed the sale of inverse floaters to the hospital, he determined that all but two of the transactions were underwritten by Kidder itself. According to Frager, Kidder dominated the market in inverse floaters and was in a position to charge any markup it wished. Frager found that Kidder's markup for many of these trades was in excess of ten percent and, according to him, fraudulent on its face under NASD guidelines. Kidder's markups were not disclosed to the hospital. Kidder's profit on these trades was $4.53 million while the hospital's "profit" was $140,901.00. According to Frager, Kidder's markups were "very, very excessive." 2 AR 25, p. 181. Frager testified that he had never seen numbers like this in his thirty years in the securities business. He summed up his opinion about this kind of trading saying, "I think this is abuse." 2 AR 25, p. 182.

Frager testified at some length about NASD Notice To Members No. 93–73, entitled: "Members' Obligations To Customers When Selling Collateralized Mortgage Obligations (CMOs)." 8 AR 29. This notice was issued to all registered firms on October 26, 1993. This was not a new warning to member firms, but a reminder of previous warnings, and the obligations recited in it were preexisting obligations. 2 AR 25, p. 102. The reminder notice indicated that it was issued in response to an increase in complaints related to CMO sales practices. The notice contained the following statement:

[I]n light of the complexity and the varying risk characteristics of CMOs, under Article III, Sections 1 and 2 of the Rules of Fair Practice, members and their associated persons must be conversant in all of the characteristics of CMOs to assess adequately the suitability of CMOs for their customers. Moreover, they must ensure that their customers understand the characteristics and risks

of CMOs. Further, adequate supervisory procedures must be in place to monitor CMO activity within each NASD member firm.

8 AR 29, p. 2.

\* \* \* \* \* \*

While principal payments may be quite predictable for certain tranches or classes of a given CMO, other tranches of the same issue may be significantly less predictable.

In addition, certain tranches may be structured in such a way that, depending on interest rates and prepayments, investors are at substantial risk and may lose all or a substantial portion of their principal. The risks associated with these less predictable tranches may make them unsuitable for many retail investors. Members must evaluate the suitability of such high-risk tranches for each individual investor based on the investor's sophistication and high-risk profile, and must ensure that the investor is aware of the risks and characteristics of the tranche.

8 AR 29, p. 3.

The notice contains the following specific warning relating to inverse floaters ("IFs"):

Inverse floaters are structured to offset floating-rate tranches. Interest payments on IFs vary inversely with an index. Because IFs are more leveraged than other tranches, they have high price volatility as interest rates move. As the rate of the index drops, the interest rate on the IF rises at an accelerated pace. Conversely, rising rates cause an IF's interest payments to drop dramatically. At worst, rising rates will lower interest payments and extend return of principal beyond the anticipated average life. As with other high-risk tranches, IFs are only suitable for sophisticated investors with a high-risk profile and the investor must be made aware of the

risks and characteristics of the IF being purchased.

8 AR 29, p. 4.

After receiving Compliance Notice 93–73, Beale's supervisors at Kidder met with him on November 11, 1993 and instructed him that he would no longer be able to sell CMO derivatives to some of his customers. Beale understood that this included the hospital. Beale could continue selling inverse floaters to the hospital only if he put the account through a series of due diligence steps, including filling out a detailed questionnaire, which would be reviewed by branch management, followed by a personal contact with the hospital to review the questionnaire to determine if the hospital was qualified to purchase such investments. Beale did not attempt to comply with these requirements and ceased selling inverse floaters to the hospital through Kidder. Kidder did not inform the hospital that it had instructed its broker to stop selling it inverse floaters because of the concerns raised in the NASD bulletin. No one at Kidder ever contacted the hospital to obtain the information necessary to complete the prescribed questionnaire in order to conduct a due diligence review of the hospital's qualifications to purchase such securities. Frager was asked whether, in his opinion, some disclosure should have been made about the instructions it had given its broker:

Q: And you testified earlier as to the internal Kidder decision with respect to notice and Mr. Beale and the termination of his IF trading with the hospital. Do you recall that?

A: Yes, sir.

Q: Do you find anywhere that there was any disclosure of that event to the client?

A: There was no disclosure.

Q: Do you have an opinion as to whether that event, in and of itself, should have required some disclosure to the client?

A: Absolutely.

Q: And why is it that that would have been, that it should have required some disclosure to the client?

A: Basically, you're leaving the client in a position where you have determined that he has an unsuitable product; and you're just leaving him at the mercy of the market in a product he shouldn't have been in, and you've determined that. I mean, that is hardly fair dealing with your customer.

2 AR 26, pp. 200–201. Kidder's failure to notify the client of the termination of Beale's authority to sell IFs to it may have been influenced by the fact that, at the time of the November 16, 1993 meeting with Beale, $14 million of new sales of IFs to the hospital were pending. These pending orders represented a profit of $1.2 million to Kidder. These transactions were subsequently closed.

Beale continued to work for Kidder with the title of Senior Vice President and he continued to sell securities to the hospital. According to Foster, however, Beale never told him that Kidder would no longer sell inverse floaters to the hospital until certain conditions were fulfilled. 2 AR 21, p. 116. Nevertheless, Beale continued to sell IFs to the hospital. Beale obtained these IFs from TDI just as he had done during his previous employment with Prudential. According to Foster, Beale explained this by saying that he was "getting the best product for the hospital, that it—he was looking after the hospital's interest." 2 AR 21, p. 115. Operating out of his office at Kidder, Beale continued selling inverse floaters to the hospital through TDI, receiving commissions from TDI, until TDI was shut down by the NASD for selling inverse floaters to unsophisticated clients.

Many of the senior personnel at Kidder were aware of the trading which had occurred in the hospital's accounts. These included Mr. Wise, the general counsel of the company; Mr. Sutton, Kidder's second or third highest ranking executive; and Mr. Ievolino, the national sales manager for fixed income securities. 2 AR 30, p.

742. All of these individuals were aware of the nature of the securities in the hospital's account when Beale was instructed that he could no longer sell inverse floaters to the hospital. *Id.* Kidder continued to monitor the hospital's portfolio and specifically noted which of the securities previously purchased from Kidder had been sold away. *Id.* at p. 762. However, Kidder maintained that it was unaware that Beale was continuing to sell inverse floaters to the hospital.

In early 1994, interest rates began to rise and the hospital's portfolio, which consisted entirely of inverse floaters, plummeted in value. If Kidder had disclosed to the hospital its concerns about the suitability of its investments in inverse floaters in mid-November 1993, when it instructed Beale that he could no longer sell inverse floaters to the hospital without completing a due diligence analysis, the hospital would have been able to liquidate its entire inverse floater portfolio without incurring any losses.

Frager testified about the duty of a brokerage firm to supervise its registered sales persons. Such supervision is required by the rules of the NASD. 2 AR 25, p. 187. Frager testified about various "red flags" that should have alerted Kidder to improprieties in Beale's sale of securities to the hospital. The first red flag occurred while Kidder was recruiting Beale, when it learned that his largest client was a small, not-for-profit hospital in Springfield, Ohio, whose investment portfolio consisted mainly of inverse floaters. The next red flag also occurred before Beale was actually hired, when he submitted trade orders to Kidder to be time-stamped before the hospital opened an account with Kidder, before Kidder had conducted a review of the hospital's investment objectives, and before it had made a suitability determination on the securities which were the subject of these trades. Each of these time-stamped trade tickets was initialed by a supervisor at Kidder. Since these trades essentially replaced the

hospital's entire portfolio without any apparent economic justification, they should also have alerted Kidder to the likelihood that Beale had *de facto* control of the hospital's account and that he was churning it for his own benefit. According to Frager, the next red flag was the letter of rejection of the hospital's trading resolution, which limited Foster's authority to purchase securities which did not conform to the hospital's stated investment policy. According to Frager, this was not just a red flag but a stop sign. In his opinion, Kidder should have stopped trading with the hospital until it was satisfied about the suitability of its investments in inverse floaters, its level of sophistication, and whether these investments were, in fact, in accordance with its investment policy. *Id.* at p. 192.

According to Frager, the next red flag occurred in September 1993, when Kidder did an internal analysis of the trading in the hospital's account, which disclosed that Beale had been churning the account. According to Frager, Kidder should have notified the hospital of its findings, and it should have identified the specific trades involved and the amount of profit earned by Kidder, including commissions and markups, in relation to the profits earned by the hospital. Instead, Kidder wrote a rather innocuous letter to Foster thanking him for his business while noting that the hospital's account had been experiencing a "relatively high level of transaction activity." The letter said that Kidder wanted "to make sure that we are handling your account in a manner satisfactory to you," and it invited Foster to call if he had any questions or concerns about his account. 8 AR 24. According to Frager, this letter was not an adequate disclosure of churning concerns. 2 AR 25, p. 198.

Based upon this and other evidence, the arbitrators found in favor of the hospital and awarded it $17 million in compensatory damages and $4.5 million in punitive damages. Kidder asserts that the compensatory damage award included $6.2

million in damages attributable to sales made by Beale through TDI in December 1993 and January 1994. Kidder says that it is not liable for any damages caused by these trades because Beale was acting outside the scope and course of his employment when he made those trades. Thus, according to Kidder, the arbitrators exceeded their powers and acted in manifest disregard of the law when they included these damages in the award. Likewise, Kidder claims that the evidence in this case did not support an award of punitive damages, and that the arbitrators acted in excess of their powers and in manifest disregard of the law when they awarded punitive damages to the hospital.

The first obstacle Kidder must overcome in its attack on the compensatory damage award is making the threshold showing that the arbitrators did, in fact, award compensatory damages for the trades Beale arranged through TDI in December 1993 and January 1994. The arbitrators did not identify any of the components of their compensatory damage award, nor did they explain how they arrived at the figure of $17 million.

Plaintiffs presented evidence of compensatory damages based solely on the Kidder trades of $12,213,622.00, computed as of December 31, 1997. 8 AR 44. In its final argument to the panel on September 14, 1998, the hospital contended that this amount should be increased by approximately five percent in order to bring the damage calculation current. This would have added $610,681.00 to the hospital's claimed loss relating solely to the Kidder trades, for a total of $12,824,302.00. In addition, the hospital argued that its compensatory damages should include the $4.5 million in profits Kidder made on the trades.

The hospital points out that case law supports the award of both excess commissions and decline in portfolio value in a churning case. *See Grandon v. Merrill Lynch & Co., Inc.,* 147 F.3d 184, 193 (2d Cir.1998); *SEC v. First Jersey Securities,*

*Inc.*, 101 F.3d 1450, 1474–75 (2d Cir.1996), *cert. denied*, 522 U.S. 812, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997); *McGinn v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 736 F.2d 1254, 1257 (8th Cir.1984); *Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 773–74 (9th Cir.1984), *aff'd*, 475 U.S. 192, 106 S.Ct. 1007, 89 L.Ed.2d 151 (1986); *Miley v. Oppenheimer & Co., Inc.*, 637 F.2d 318, *reh'g en banc denied*, 642 F.2d 1210 (5th Cir.1981). Thus, according to the hospital, the evidence and arguments presented to the arbitration panel would have justified a compensatory damage award of approximately $17.3 million based on the Kidder trades alone.

■■■ Kidder responded to these arguments by filing a motion for leave to amend its answer and cross-petition in order to assert the defense that the arbitrators award of excess profits as part of plaintiffs' claim for compensatory damages resulted in double recovery to plaintiffs. Kidder now argues that this is an additional ground for summary judgment on its cross-petition. The court disagrees. Case law supports the proposition that churning may cause two distinct harms for which the client is entitled to separate compensation. Excessive trading can result in a decline in the value of the investor's portfolio as well as excessive profits to the brokerage firm. Here, plaintiffs' evidence amply demonstrated that they sustained harm through a decline in the value of their portfolio, which resulted from not only excess trading, but also from the unsuitability of the investments recommended. Plaintiffs also proved that Kidder earned substantial undisclosed profits as a result of the excess trading. Plaintiffs are entitled to recover their losses and to require Kidder to disgorge its excess profits of $4.5 million. This figure represents only the profits resulting from Kidder's undisclosed markups and does not include Beale's excess commissions, which in themselves exceeded $1 million. There is no double counting here. Plaintiffs' damage calculation was based upon the decline in the value of their portfolio compared to the profits they would have earned had their funds been properly invested. It did not include the difference between Kidder's cost for the inappropriate securities it sold the hospital and the price it charged the hospital for those securities.

■■ Since the hospital's evidence of compensatory damages included a claim for loss of portfolio value in the amount of $12.8 million, as well as a claim for disgorgement of excess markups in the amount of $4.5 million, it is impossible to know whether the arbitrators' award of $17 million includes any compensatory damages based on Beale's sales of inverse floaters through TDI during the months of December 1993 and January 1994. Thus, Kidder has failed to make the necessary threshold showing to support its arguments that the arbitrators exceeded their powers and acted in manifest disregard of the law by including damages for the TDI trades in their award of compensatory damages. *See Federated Department Stores, Inc. v. J.V.B. Industries, Inc.*, 894 F.2d 862, 868 (6th Cir.1990).

■■ Assuming *arguendo* that the compensatory damage award of $17 million did include losses which plaintiffs incurred on the inverse floaters Beale sold them through TDI during the months of December 1993 and January 1994, there are several legal theories which would permit plaintiffs to recover these losses as part of their claims against Kidder. The first of these is the simple proposition that the losses from the TDI trades were the proximate result of Kidder's failure to notify the hospital that it had terminated Beale's authority to sell it inverse floaters until a suitability determination had been made in light of the concerns raised in NASD Compliance Notice 93–10. This occurred on November 11, 1993, and a disclosure by Kidder at that time would have resulted in a determination that the hospital's entire portfolio of inverse floaters was inappropriate and unsuitable, and the entire port-

folio could have been liquidated at that time without any loss to the hospital. Henceforth, the hospital would not have purchased inverse floaters from anyone. Such a disclosure was not made. The hospital continued to believe that inverse floaters were suitable for its investment accounts and it purchased additional inverse floaters from TDI during the following two months.

Losses from those additional purchases were foreseeable to Kidder. Indeed, Kidder closely monitored the hospital's portfolio during this time frame to determine whether its risk of liability to the hospital was being mitigated by the hospital's sale of the IFs it had purchased from Kidder. Not only was the loss foreseeable, but it actually occurred soon after the failure to disclose, when interest rates began to rise in early 1994.

If the arbitrators found that plaintiffs were entitled to recover damages from Kidder for the losses resulting from the TDI trades on the basis that Kidder's breach of its duty of disclosure in November 1993 was a proximate cause of those losses, this court would not be persuaded that such a finding was in manifest disregard of the law.

■ There are additional grounds for holding Kidder liable for the TDI trades, which are based on the fact that these trades were recommended by Beale while he continued in his employment as a senior vice president of Kidder, using the facilities and trappings of his office at Kidder without any disclosure to the hospital that he was not acting in the scope and course of his employment with Kidder when he recommended those trades. Thus, it is conceivable that the arbitrators could have held Kidder liable for the TDI trades under principles of agency law, including the doctrine of apparent authority. Plaintiffs argue that Kidder clothed Beale with the apparent authority to act as its investment advisor, including the apparent authority to recommend investments, and that Kidder never notified the hospital that it had

revoked Beale's authority to recommend inverse floaters. According to plaintiffs, they relied on Beale's assurances that he was acting in their best interests as their investment advisor when he recommended that they purchase IF's through TDI. They were unaware that it was outside the scope of Beale's authority to recommend an investment which had to be purchased from another firm when it was not available from Kidder. Thus, plaintiffs argue that, even though the December 1993 and January 1994 purchases of IFs were made from TDI, they were not aware that Beale's recommendation of such purchases was outside the scope and course of his employment by Kidder. Plaintiffs have cited cases which support their argument that Kidder may be held responsible for the TDI trades under the doctrine of *respondeat superior*. *See Holloway v. Howerdd,* 536 F.2d 690, 696 (6th Cir.1976); *Lewis v. Walston & Co., Inc.,* 487 F.2d 617, 624 (5th Cir.1973); *In re Laser Arms Corp. Securities Litigation,* 794 F.Supp. 475, 485 (S.D.N.Y.1989).

■ Plaintiffs further argue that the arbitrators could have found Kidder liable for the TDI trades under the theory of control person liability under § 20(a) of the SEC Act, 15 U.S.C. § 78t. The court agrees that if the arbitrators accepted plaintiffs' interpretation of the evidence, including the opinions of their expert witness, Frager, they could have found that plaintiffs had proved all of the elements of control person liability and that Kidder had failed to prove the affirmative defense that it had "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *See, e.g., Harrison v. Dean Witter Reynolds, Inc.,* 79 F.3d 609 (7th Cir.1996), *cert. denied,* 519 U.S. 825, 117 S.Ct. 86, 136 L.Ed.2d 43 (1996).

Thus, the court is satisfied that there are at least three viable legal theories under which the arbitrators could have awarded damages against Kidder for the

losses the plaintiffs sustained as a result of the TDI trades.

■ The court has little difficulty finding that the award of punitive damages was well within the powers of the arbitrators and was not in manifest disregard of the law. The evidence clearly supports a finding that Kidder was guilty of aggravated or egregious fraud when it actively recruited Beale, knowing that his major client was a small not-for-profit hospital, and that he apparently exercised *de facto* control over its account, which he had invested entirely in unsuitable, highly risky CMO derivatives contrary to the hospital's written investment policy. Kidder also permitted Beale to violate the limitations the hospital had imposed upon the authority of its investment officer. Finally, in all of this, Kidder was motivated by greed and the hope that it would reap huge profits through Beale's continued sale of inverse floaters to the hospital, which it did to the tune of $4.5 million, and then abandoned the hospital with a portfolio filled with its own "toxic waste" after receiving a warning from the NASD, and without informing the hospital that it had revoked Beale's authority to sell it IFs hoping that Beale would soon replace them, and knowing that it was quite likely that he would do so by continuing to churn the hospital's account and replace its existing investments with similar securities even if he had to obtain them outside Kidder. This scenario, which tracks the plaintiffs' evidence and the testimony of its expert witness, Frager, clearly supports an award of punitive damages. Indeed, since the amount of punitive damages awarded seems to reflect only the excess profits earned by Kidder, it might even be considered conservative.

Plaintiffs' motion for summary judgment is granted. Kidder's motion for summary judgment is denied. The Clerk shall enter final judgment in favor of the plaintiffs confirming the arbitration award of October 16, 1998.

It is so ORDERED.